**Linda SPAULDING and Tammy Spaulding, Individually and as Personal Representatives for the Estate of Mattie Spaulding, Deceased, Appellants–Plaintiffs,**

v.

**Erinn R. HARRIS, M.D. and Health and Hospital Corporation of Marion County d/b/a Wishard Memorial Hospital, Appellees–Defendants.**

No. 49A02–0810–CV–954.

Court of Appeals of Indiana.

Oct. 8, 2009.

Rehearing Denied Dec. 2, 2009.

☞555.4(3)

Nathaniel Lee, Esq., Laura Crowley, Esq., Lee, Cossell, Keuhn & Love, LLP, Indianapolis, IN, Attorneys for Appellants.

Michael G. Getty, Rori L. Goldman, Hill Fulwider McDowell Funk & Matthews, Indianapolis, IN, Attorneys for Appellee Erinn R. Harris, M.D.

Mary M. Ruth Feldhake, Matthew W. Conner, Tabbert Hahn Earnest & Weddle, LLP, Indianapolis, IN, Attorneys for Appellee Health and Hospital Corp. of Marion County d/b/a Wishard Memorial Hospital.

## OPINION

VAIDIK, Judge.

### Case Summary

Decedent Mattie Spaulding sustained a subdural hematoma shortly after receiving anticoagulation treatment from Dr. Erinn R. Harris at Wishard Memorial Hospital. Mattie's family filed this action alleging that Dr. Harris's and Wishard's negligence precipitated Mattie's brain injury. A jury found in favor of Dr. Harris and Wishard,

and the Spauldings appealed. We hold that the trial court erred in excluding expert opinions that were based in part on a professional publication that reflected a legitimate accumulation of the expert's knowledge and expertise, but we find this error to be harmless. We further hold that redaction of the words "Department of Insurance" from the medical review panel opinion was not improper and the trial court did not abuse its discretion by prohibiting cross-examination that was outside the scope of direct. We affirm.

### Facts and Procedural History

Mattie Spaulding was fifty-eight years old and morbidly obese. In March 2002 she was diagnosed with congestive heart failure and underwent emergency aortic valve replacement surgery. Heart valve replacements are susceptible to blood clots, so after the procedure Mattie was placed on the blood thinner known as Coumadin. On May 7, 2002, she consulted Dr. Harris at Wishard's Blackburn Community Health Center for post-operative blood monitoring. Dr. Harris ordered weekly laboratory testing to monitor Mattie's coagulant function.

Coagulation is measured using "protime" tests, which determine how long it takes sampled blood to clot. The standard unit of measurement for protime is the Internal Normalized Ratio (INR). Mattie's target INR after surgery was between 3 and 4. The weekly blood tests showed that Mattie's INR level was below her therapeutic range. Dr. Harris therefore increased Mattie's Coumadin dosage progressively. Mattie's protime was last checked on June 4, 2002. At that time her INR level registered at 3.7.

On June 20, 2002, the Wishard Ambulance Service was called to Mattie's residence. Mattie complained to paramedics of a fever, nausea, and a headache, but she refused transport three times and was not brought to the hospital. Three days later Mattie fell down and again complained of headaches and bruising. Paramedics brought her to Community Hospital where she was diagnosed with a subdural hematoma, an accumulation of blood inside the brain. Her INR level was greater than 16.

Mattie underwent a craniotomy to evacuate the hematoma. Neurological surgeon Dr. Michael M. Burt saw Mattie after the procedure. He ordered her to remain off of her anticoagulant medication for two weeks to avoid the risk of bleeding. Mattie was admitted to a rehabilitation facility, and she resumed her medication two weeks later. However, on July 12, 2002, Mattie suffered acute respiratory failure. She died the following day. An autopsy revealed the cause of death to be a pulmonary embolism, a blood clot that travels to the lungs and prevents oxygenation.

Mattie's family ("the Spauldings") submitted a proposed complaint to the Indiana Department of Insurance against Dr. Harris and Wishard. The Spauldings alleged that Dr. Harris failed to adequately monitor Mattie's coagulation and that Mattie developed her injuries as a result of Dr. Harris's negligence. A medical review panel heard the case and issued a written opinion in May 2006. Two of the medical review panelists found that there existed a "material issue of fact, not requiring expert opinion, bearing on liability of both Defendants for consideration by the court or jury." The third panelist, Dr. Cheryle D. Southern, found that the evidence supported the conclusion that the defendants failed to comply with the appropriate standard of care. The Spauldings proceeded by filing a complaint in Marion Circuit Court, and they pursued two principal claims against the defendants: (1) negligence by Dr. Harris in failing to properly monitor Mattie's blood work and (2) negli-

gence by Wishard in misplacing some of Mattie's lab results.

Before trial the parties deposed Dr. Southern. Dr. Southern was a primary care internist with a special interest in geriatrics. She was experienced in administering blood thinners, monitoring coagulation, and treating subdural hematomas. Dr. Southern testified that, according to a medical article she had consulted, INR levels greater than 6 are extremely dangerous and can cause spontaneous bleeds. She believed Dr. Harris should have tested Mattie's INR at least twice between June 4 and 23. Dr. Southern opined that Dr. Harris's failure to monitor properly "was a factor in [Mattie's] development of the . . . vastly elevated protime, which could have caused her to bleed from her gut, her head, her—you know, just anywhere." Tr. Vol. I p. 41. Dr. Southern testified that "the elevated protime and INR, which was caused by the lack of monitoring by Dr. Harris, contributed greatly to Mattie Spaulding's subdural hematoma." *Id.* at 47. She further explained that Mattie's hematoma necessitated a craniotomy, the craniotomy required Mattie to stop taking her anticoagulant medication, and the two weeks without medication increased Mattie's risk of developing the pulmonary embolism.

The parties also deposed Dr. Burt. Dr. Burt testified that "being supratherapeutic made it easier, I think, for [Mattie] to get the hemorrhage." Tr. Vol. II p. 9. He hypothesized that "when [Mattie] did bleed from whatever cause, spontaneous or traumatic, that the bleed most likely was bigger than it would have been without her being supratherapeutic on her anticoagulation. It may not have been as much if she was in the normal range. . . ." *Id.*

The Spauldings proffered both Dr. Southern's and Dr. Burt's videotaped depositions at trial. Wishard objected to Dr. Southern's causation testimony as being based on hearsay and lacking foundation. The trial court redacted portions of Dr. Southern's causation testimony that were based on medical literature, but it admitted all statements from Drs. Southern and Burt quoted above.

The Spauldings also introduced a certified copy of the medical review panel opinion. The opinion had a stamp, seal, and caption referring to the State of Indiana Department of Insurance. Wishard moved to redact the words "Department of Insurance" from the exhibit because the term constituted an improper reference to a liability coverage provider. The Spauldings requested that the phrase not be redacted so as to preserve the panel opinion and demonstrate its authenticity. The trial court granted Wishard's motion and admitted a redacted copy of the exhibit.

The Spauldings elicited evidence at trial that Wishard misplaced Mattie's June 20 ambulance record. Wishard therefore called Thomas Arkins, the special operations manager of Wishard Ambulance Service. Arkins introduced and authenticated the allegedly missing record. He further testified that paramedics had been called to Mattie's residence on June 20 and that Mattie refused transport by the ambulance. On cross-examination, the Spauldings pointed out that Mattie had complained of a headache. The Spauldings asked what paramedics are taught to do if a patient has a headache and whether they should document if a patient is on anticoagulant medication. The Spauldings also asked if headaches were a symptom of cerebral bleeding. Wishard and Dr. Harris objected to the foregoing questions on relevancy grounds, and the trial court sustained their objections.

The jury found in favor of Dr. Harris and Wishard. The Spauldings now appeal.

## Discussion and Decision

The Spauldings raise three issues, which we reorder and restate as follows: (1) whether the trial court erred by excluding select causation testimony from Dr. Southern, (2) whether the trial court erred by redacting the words "Department of Insurance" from the medical review panel's certified opinion, and (3) whether the trial court erred by restricting cross-examination of Arkins.

### I. Standard of Review for Evidentiary Matters

Rulings on the admissibility of expert testimony lie within the discretion of the trial court and will be reversed only for an abuse of discretion. *Cox v. Matthews*, 901 N.E.2d 14, 21 (Ind.Ct.App.2009), *reh'g denied, trans. dismissed.* An abuse of discretion occurs if the trial court's decision is clearly against the logic and effect of the facts and circumstances before the court. *Walker v. Nelson*, 911 N.E.2d 124, 130 (Ind.Ct.App.2009). "Error may not be predicated upon a ruling which admits or excludes evidence unless a substantial right of the party is affected, and ... [i]n case the ruling is one excluding evidence, the substance of the evidence was made known to the court by a proper offer of proof, or was apparent from the context within which questions were asked." Ind. Evidence Rule 103(a).

### II. Exclusion of Dr. Southern's Causation Testimony

The Spauldings proffered the following deposition testimony from Dr. Southern at trial. Portions that are boldfaced and underlined were redacted by the trial court:

1. Indiana Evidence Rule 704 actually provides as follows:
   (a) Testimony in the form of an opinion or inference otherwise admissible is not objectionable merely because it embraces an ultimate issue to be decided by the trier of fact.

[BY PLAINTIFFS' COUNSEL:]

Q Did you—did you ever learn whether a certain INR would put someone at greater risk for a spontaneous bleed?

A Yes.

Q **What did you learn?**

[DR. HARRIS'S COUNSEL]: **Objection. This is—this is going to be based upon hearsay. It lacks foundation. It's outside this individual's area of expertise and it's beyond the proper scope of panelist testimony.**

[PLAINTIFFS' COUNSEL]: **Rule 704 [sic]** [1] **specifically allowed an expert to use learned treatises, articles of evidence, even though hearsay, to form her opinion. So, the trial rule specifically allows for an expert to review treatises and review evidence to formulate an opinion.**

\* \* \* \*

A **These—we've had patients who have had bleeding do—or the risk of bleeding in my medical practice mainly because of low platelet counts, platelet counts in the ten to twenty-thousand range. And some of them are cancer patients, some of them have bleeding disorders.**

**And, so, I had looked in the literature, because, I mean, the issue is whether or not you clot. That's the real issue. Whether it's platelets, whether it's your—the coag factors, if you can't clot, you get the same things.**

(b) Witnesses may not testify to opinions concerning intent, guilt, or innocence in a criminal case; the truth or falsity of allegations; whether a witness has testified truthfully; or legal conclusions.

But I had looked and asked if there was a level at whichwhere there was an article. I was just asking for an article which would show at what level you could expect a spontaneous bleed.

Q  And did you learn what that level might be?

[DR. HARRIS'S COUNSEL]: Same objection.

\*      \*      \*      \*      \*      \*

THE WITNESS: And, basically, it's in the articles that everyone got, that levels about 6 are considered to be extremely dangerous levels. It's in the protocol, immediate—one of the protocols, either from Mayo that you've all received, that something immediately needs to be done.

BY [PLAINTIFFS' COUNSEL]:

Q  Do you recall what Mattie Spaulding's INR was at the time she presented to Community Hospital on June 23, 2002?

A  It was immeasurable, because it was too high.

Q  So that would equate to greater than 6?

A  Considerably greater than 6.

Q  Were you able to reach an opinion as to whether the supratherapeutic INR caused an injury to Mattie Spaulding?

[DR. HARRIS'S COUNSEL]: Objection, lacks foundation, beyond this witness' area of expertise.

THE WITNESS: We felt—as a panel, we felt that the—

[DR. HARRIS'S COUNSEL]: Objection, nonresponsive.

THE WITNESS:—abated INR. There was a second statement there on that, the other two people.

BY [PLAINTIFFS' COUNSEL]:

Q  Okay. Let's just backtrack. Mattie Spaulding's INR was supratherapeutic at the time she presented to Community Hospital, correct?

A  Yes.

Q  Do you believe that that caused an injury to Mattie Spaulding?

[DR. HARRIS'S COUNSEL]: Same objection, foundation, outside the area of expertise.

THE WITNESS: Yes.

BY [PLAINTIFFS' COUNSEL]:

Q  And is that based on your experience and your review of medical literature?

A  Yes. I said I've had it happen to me.

Q  Do you believe that any of the care that was provided to Mattie Spaulding by Dr. Harris caused an injury to her?

[DR. HARRIS'S COUNSEL]: Same objections.

BY [PLAINTIFFS' COUNSEL]:

Q  And, again, based on your experience and your review of the records and your experience with monitoring PTs, INRs?

A  I felt that—I felt that the lack of protime monitoring contributed to the protime getting that far out of, the generic, out of whack. She should have had at least, when she had that 3.7, she should have had at least two more protimes. There was time to have gotten two more before she—the protocols show that you should have it weekly until it's stable, and we have no protines between the 4th and the 23rd.

Q  Do you believe that that was a substantial fact in her development of the subdural hematoma?

[DR. HARRIS'S COUNSEL]: Objection, same objections.

THE WITNESS: It was a factor in her development of the supra—the vastly elevated protime, which could have caused her to bleed from her gut, her head, her-you know, just anywhere.

BY [PLAINTIFFS' COUNSEL]:

Q And that's with or without trauma?

A Yes.

[DR. HARRIS'S COUNSEL]: Same objections.

\* \* \* \* \* \*

Q Is it your opinion today that the elevated protime and INR, which was caused by the lack of monitoring by Dr. Harris, contributed greatly to Mattie Spaulding's subdural hematoma?

[DR. HARRIS'S COUNSEL]: Objection, lacks foundation, beyond the area of expertise.

BY [PLAINTIFFS' COUNSEL]:

Q Well, okay. Let's—

A Yes.

Q Do you feel that Dr. Harris monitored Mattie Spaulding's INR appropriately?

A No.

Q So, again, I ask you is it your opinion today that the elevated INR and the lack of proper monitoring by Dr. Harris contributed greatly to Mattie Spaulding's subdural?

[DR. HARRIS'S COUNSEL]: Same objection.

THE WITNESS: Yes

Tr. Vol. I p. 37–47.

The Spauldings argue that the trial court improperly excluded those portions of Dr. Southern's testimony shown above.

Under the Indiana Medical Malpractice Act, a malpractice claimant must submit a proposed complaint to an Indiana Department of Insurance medical review panel before filing an action in court. Ind. Code § 34–18–8–4(1). A medical review panel consists of three licensed healthcare providers and is chaired by one attorney. *Id.* § 34–18–10–3. The review panel receives evidence from the parties, consults other medical authorities if necessary, and renders a written opinion as to whether the defendant met the applicable standard of care. *Id.* §§ 34–18–10–21, –22. The plaintiff may pursue his claim in court after the panel has issued its opinion. *Id.* § 34–18–8–4(2). The panel opinion is admissible at trial, and "either party, at the party's cost, has the right to call any member of the medical review panel as a witness. If called, a witness shall appear and testify." *Id.* § 34–18–10–23. The purpose of the Medical Malpractice Act generally is to help maintain the availability of healthcare services in Indiana, which the General Assembly believed was being eroded by tort suits, and to help control the costs of medical liability insurance, litigation, settlements, and excessive judgments against healthcare providers. *Mayhue v. Sparkman,* 653 N.E.2d 1384, 1386 (Ind.1995). The purpose of Section 34–18–10–23 is to provide "safeguards for complainants who wish to attack the efficacy of the panel's decision." *Dickey v. Long,* 575 N.E.2d 339, 340 (Ind.Ct.App.1991), *opinion adopted by Dickey v. Long,* 591 N.E.2d 1010 (Ind.1992).

Indiana Evidence Rule 702 provides that:

(a) If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may

testify thereto in the form of an opinion or otherwise.

(b) Expert scientific testimony is admissible only if the court is satisfied that the scientific principles upon which the expert testimony rests are reliable.

Two requirements must be met in order for a witness to qualify as an expert. *Norfolk Southern Ry. Co. v. Estate of Wagers,* 833 N.E.2d 93, 101 (Ind.Ct.App.2005). First, the subject matter must be distinctly related to some scientific field, business, or profession beyond the knowledge of the average layperson; and second, the witness must be shown to have sufficient skill, knowledge, or experience in that area so that the opinion will aid the trier of fact. *Id.* The proponent of expert testimony bears the burden of establishing the foundation and reliability of the scientific principles and tests upon which the expert's testimony is based. *Id.* at 101–02.

▪ An expert witness can draw upon all sources of information coming to his knowledge or through the results of his investigation in order to reach a conclusion. *Kranda v. Houser–Norborg Med. Corp.,* 419 N.E.2d 1024, 1034 (Ind.Ct.App. 1981), *reh'g denied with opinion,* 424 N.E.2d 1064. An expert may rely on hearsay when she uses other experts and authoritative sources of information like treatises to aid her in rendering an opinion. *Bixler v. State,* 471 N.E.2d 1093, 1099 (Ind.1984). Hearsay information customarily relied on by experts in the practice of their professions may be relied upon as a legitimate accumulation of that expert's knowledge. *Id.* "[I]n a broad sense almost all expert opinion about scientific propositions embodies hearsay indirectly. Whenever an expert testifies, she implicitly draws on such material as lectures she heard and textbooks she read during her education." 1 Kenneth S. Broun, *McCormick on Evidence* § 15 (6th ed.2006).

▪ Here Dr. Southern testified that substandard protime monitoring contributed to Mattie's brain injury. As an internist experienced in dosing blood thinners and treating hematoma, Dr. Southern had a thorough understanding of the medical subject matter involved in this case. And as a panelist who first entertained the Spauldings' complaint, Dr. Southern was familiar with the facts and circumstances surrounding Mattie's death. Dr. Southern was qualified to provide an expert opinion by reason of her education, background, training, and understanding of the facts at issue. The trial court excluded portions of her testimony apparently because they were based in part on a medical article about unsafe INR levels. But Dr. Southern was a qualified expert and was at liberty to consult medical literature from her field to analyze the case and render an opinion. We agree with the defendants that Section 34–18–10–23 does not give review panel members a free pass to testify on any matters they so choose. We also acknowledge that Dr. Southern did not express an opinion on causation in the medical review panel opinion. But when she was deposed, Dr. Southern was not just a medical review panel member permitted to testify within the confines of the panel opinion— she was also qualified as a medical expert under Rule 702. Dr. Southern was therefore competent to provide her opinion on the connection between Dr. Harris's protime monitoring and Mattie's hematoma, and she was allowed to rely on professional publications as a "legitimate accumulation" of her knowledge and expertise. We therefore find that the trial court erred by excluding portions of Dr. Southern's causation testimony merely because they relied in part on a medical article.

▪ That being said, even if an evidentiary decision was an abuse of discretion, we will not reverse if the ruling

constituted harmless error. *Decker v. Zengler,* 883 N.E.2d 839, 845 (Ind.Ct.App. 2008), *reh'g denied, trans. denied.* An error is harmless if it does not affect the substantial rights of the parties. Ind. Trial Rule 61; *Bonnes v. Feldner,* 642 N.E.2d 217, 219 (Ind.1994). Where wrongfully excluded testimony is merely cumulative of other evidence presented, its exclusion is harmless error. *Linton v. Davis,* 887 N.E.2d 960, 977 (Ind.Ct.App. 2008), *trans. denied.* The trial court did not redact all of Dr. Southern's opinions on causation from the videotaped deposition. The court admitted at least three statements by Dr. Southern explicitly tying Dr. Harris's alleged negligence to Mattie's pathology. Dr. Southern twice testified that lack of monitoring and elevated protimes "contributed greatly" to Mattie's subdural hematoma. The trial court also admitted testimony from Dr. Burt drawing a connection between Mattie's elevated INR levels and the severity of her hemorrhage. Because the excluded testimony was cumulative of other evidence presented, we conclude that any error in the exclusion of Dr. Southern's statements was harmless.

### III. Redaction of "Department of Insurance"

The Spauldings next argue that the trial court erred by redacting the words "Department of Insurance" from the medical review panel's official opinion. The Spauldings contend that the redaction discredited the exhibit and diluted the medical review process.

Indiana Code section 34–18–10–23 provides that in medical malpractice cases, "[a] report of the expert opinion reached by the medical review panel is admissible as evidence in any action subsequently brought by the claimant in a court of law." Indiana courts have described this provision as "unambiguous and absolute." *Haas v. Bush,* 894 N.E.2d 229, 234–35 (Ind.Ct.App.2008) (quoting *Dickey,* 591 N.E.2d at 1011), *trans. denied.* Our Supreme Court has further held that panel opinions must be certified by the Indiana Department of Insurance to be admissible under the statute. *Bonnes v. Feldner,* 642 N.E.2d 217, 219 (Ind.1994).

Meanwhile Indiana Evidence Rule 411 provides as follows:

> Evidence that a person was or was not insured against liability is not admissible upon the issue whether the person acted negligently or otherwise wrongfully. This rule does not require the exclusion of evidence of insurance against liability when offered for another purpose, such as proof of agency, ownership, or control, or bias or prejudice of a witness.

Indiana Evidence Rule 411 tracks Federal Rule of Evidence 411 verbatim. 23 Charles Alan Wright & Kenneth W. Graham, Jr., *Federal Practice & Procedure* § 5361 n. 13 (Supp.2009). The purpose of Rule 411 and its federal counterpart is to prevent juries from inferring fault or calculating damages based on parties' liability coverage or lack thereof. Fed.R.Evid. 411 advisory committee's note. The primary concern is that jurors will award excessive damages if they know an insurance company will be satisfying the judgment, or nominal damages if they learn the defendant will be paying out of his own pocket. *Stone v. Stakes,* 749 N.E.2d 1277, 1280 (Ind.Ct.App.2001), *aff'd on reh'g,* 755 N.E.2d 220, *trans. denied.*

Notwithstanding the general bar imposed by Rule 411, insurance evidence may be admitted for purposes other than implying fault or influencing damage awards. Broun, *supra,* § 201. Rule 411 provides a non-exhaustive list of permissible purposes, but "[t]he number of possible

alternative uses of the existence or nonexistence of liability insurance evidence is, of course, unlimited." David P. Leonard, *The New Wigmore: Selected Rules of Limited Admissibility* § 6.9 (2002). "If the evidence is offered for a purpose not prohibited by Rule 411, admissibility is governed by the balancing test of Rule 403, and exclusion may be appropriate if the fact to be proven is not in genuine dispute." 12 Robert Lowell Miller, Jr., *Indiana Practice* § 411.102 (3d ed.2007). Evidence Rule 403 provides that "[a]lthough relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, or needless presentation of cumulative evidence."

Here the Spauldings sought to introduce a certified copy of the medical review panel opinion in accordance with Section 34–18–10–23. The opinion had a stamp, seal, and caption referring to the State of Indiana Department of Insurance, and Wishard moved to exclude any reference to the "Department of Insurance" under Rule 411. The Spauldings argued that the labels served a purpose other than showing Wishard's indemnification. They claimed the words "Department of Insurance" conveyed the authenticity of the panel opinion and would show the jury that the plaintiffs had observed all procedural formalities. In light of the Spauldings' alternative explanation, the trial court had discretion to balance the evidence's probative value against its prejudicial effect pursuant to Rule 403. The trial court chose to exclude the words "Department of Insurance" and admit a redacted copy of the exhibit. We cannot say that the trial court abused its discretion when finding that the probative value of bolstering the opinion's authenticity was outweighed by the prejudicial effect of indicating that Wishard was insured. The authenticity of the opinion was never disputed in the first instance, and the document bore the remainder of its official seal and the signatures of all panel members.

■ We acknowledge Section 34–18–10–23 provides that panel opinions are unconditionally admissible at trial. But we do not construe the statute to mandate unconditional admission of their stamps, seals, or other ministerial accoutrements. And though *Bonnes* may require certification by the Indiana Department of Insurance for purposes of authenticating the opinion to the trial court, we do not believe that the opinion's seal must be preserved after foundational requirements have been met.

We conclude that the trial court did not abuse its discretion by excluding the words "Department of Insurance" and admitting a redacted copy of the certified opinion.

### IV.  Restriction of Arkins' Cross–Examination

■ At some point the Spauldings elicited evidence that Wishard had lost Mattie's June 20 ambulance record. The Spauldings apparently sought to argue to the jury that Wishard had misplaced Mattie's blood work in the same way it had misplaced the ambulance record. Wishard therefore called Thomas Arkins, the special operations manager of Wishard Ambulance Service, to introduce and authenticate the missing record. Arkins also testified from the record that Mattie had refused transport to the hospital three times. The Spauldings asked Arkins the following questions on cross-examination:

Q   And does the paramedics in your profession, is there a standard that you go by; in other words, is there a certain protocol that you're required

to do when you have a patient with certain type of distress signals?

A Yeah. Our paramedics are guided by a medical director, who is over—we work under his license. And they set guidelines about what we should look at and things like that, certain types of treatments based upon signs and symptoms.

Q And, as a paramedic, if you have a patient who has a severe headache what are you taught to do?

Q Evaluate, look and see—

[DR. HARRIS'S COUNSEL]: Objection, relevance.

THE COURT: Sustained.

\* \* \* \* \* \*

Q And so anywhere in this record does it says that this patient was asked whether or not she was on a blood thinner?

A They've documented, it says, see list for her medications. And not knowing this, I don't know whether the family provided a list or how that was—why that was documented that way. Having not been there, I can't testify to that.

Q Okay. If a person on is on a high dose of blood thinner, that's something that should be documented?

A We should document the patient's medications, yes.

Q And would it be below a standard of care—

[WISHARD'S COUNSEL]: Objection, your Honor.

THE COURT: Don't go there. I'll sustain the objection.

[PLAINTIFFS' COUNSEL]: Can we approach?

THE COURT: No.

BY [PLAINTIFFS' COUNSEL]:

Q Now, what is documented as this patient's chief complaint?

A This one, it says the family called, stated patient wasn't feeling well today. The patient complained of flu-like symptoms—fever, nausea, headache—times one day, physical exam, skin warm and dry, bilateral breath sounds were clear and equal, no difficulty breathing, pupils equal round and reacted to light. No chest pains, moves all extremities well. Vitals taken, stated above. And then we went to the patient refused transport at that point.

Tr. Vol. I p. 93–96. Wishard declined redirect, and Dr. Harris proceeded to cross-examine Arkins. Dr. Harris elicited testimony from Arkins that sometimes the call type documented by a 911 dispatcher is not the actual medical problem confirmed by responding paramedics. Arkins testified that the June 20 ambulance run was dispatched for non-traumatic bleeding, but the ambulance run report did not reflect that Mattie was bleeding when paramedics saw her. Wishard again declined redirect. The Spauldings then attempted to recross-examine Arkins as follows:

Q Sir, you just testified, I think, that on June the 20th, that you saw there was nothing documented that this patient was bleeding, right?

A According to the dispatch log, it was dispatched as bleeding, non-traumatic.

Q Right. A cerebral bleed, can you see that with your eyes?

[DR. HARRIS'S COUNSEL]: Objection, your Honor. We're outside what the document says.

THE COURT: Sustained.

BY [PLAINTIFFS' COUNSEL]:

Q   Well, headaches, is that a symptom that a person could have cerebral bleeding?

**[DR. HARRIS'S COUNSEL]:** Same objection, your Honor. You've already ruled on this line of questioning.

**THE COURT:** Sustained.

**[PLAINTIFFS' COUNSEL]:** Judge, but this relates solely to the issue of bleeding. He's testified—

**THE COURT:** The objection's been sustained.

*Id.* at 104–105.

■ The Spauldings argue that the trial court improperly restricted their questioning. On appeal, arguments "must contain the contentions of the appellant on the issues presented, supported by cogent reasoning." Ind. Appellate Rule 46(A)(8)(a). A party generally waives any issue for which it fails to develop a cogent argument or support with adequate citation to authority and portions of the record. *Romine v. Gagle,* 782 N.E.2d 369, 386 (Ind. Ct.App.2003).

■ "Cross-examination should be limited to the subject matter of the direct examination and matters affecting the credibility of the witness. The court may, in the exercise of discretion, permit inquiry into additional matters as if on direct examination." Ind. Evidence Rule 611(b). If, on direct examination, a party leaves the trier of fact with a false or misleading impression of the facts related, the direct examiner may be held to have "opened the door" to the cross examiner to explore the subject fully, even if the matter so brought out on cross examination would otherwise have been inadmissible. *Reeves v. Boyd & Sons, Inc.,* 654 N.E.2d 864, 872 (Ind.Ct. App.1995).

Here the Spauldings sought to cross-examine Arkins about paramedic protocol and the standard of care for paramedics treating patients with headaches. The Spauldings made no offer of proof, so we are not certain what the excluded testimony would have revealed, but it appears as though the Spauldings wanted to show substandard care on the part of Wishard paramedics. The Spauldings' questions thus exceeded the scope of Wishard's direct and Dr. Harris's cross-examinations, and the trial court had discretion to exclude the solicited testimony. The Spauldings nonetheless contend that Wishard and Dr. Harris "opened the door" to their line of questioning by asking Arkins about Mattie's ambulance records. We are not sure how the defendants invited the Spauldings' cross-examination questions, and the Spauldings make no coherent argument on appeal explaining how the door was opened. The Spauldings claim they should have been allowed "to clarify the records entered into evidence and ARKINS['] testimony related to those records," and that "it became necessary and reasonable for the SPAULDINGS to clarify these statements and sometimes rebut ARKINS' direct testimony." Appellant's Br. p. 21–22. But the Spauldings provide no substantive explanation as to how their questioning related to Arkins' direct and cross-examinations. For the reasons stated, we find that the trial court did not abuse its discretion by sustaining Wishard's and Dr. Harris's objections.

Affirmed.

NAJAM, J., and FRIEDLANDER, J., concur.