**Pursuant to Ind.Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.**



ATTORNEY FOR APPELLANT:

**KAREN A. WYLE**
Karen A. Wyle Law Office
Bloomington, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

FAWN MCDONALD-WOOLRIDGE,      )
                                                    )

    Appellant-Petitioner,        )

                                                   )

        vs.        )      No.  53A01-1204-DR-593

                                                   )

JACOB WOOLRIDGE,      )
    Appellee-Respondent.        )

APPEAL FROM THE MONROE CIRCUIT COURT
The Honorable Valeri Haughton, Judge
Cause No. 53C08-0504-DR-233

**November 19, 2013**

**MEMORANDUM DECISION - NOT FOR PUBLICATION**

**ROBB, Chief Judge**

Fawn McDonald-Woolridge ("Mother") appeals the trial court's order regarding custody and parenting time. Mother presents four issues on appeal: 1) whether the trial court's findings of fact are erroneous; 2) whether the trial court abused its discretion in failing to consider certain evidence; 3) whether the trial court abused its discretion in finding Mother in contempt; and 4) whether the trial court improperly delegated the authority to determine when Jacob Woolridge's ("Father") parenting time should become unsupervised. Concluding that the findings of fact are not clearly erroneous and the trial court did not abuse its discretion as to admission of evidence or finding Mother in contempt, but that whether to move Father to unsupervised parenting time is properly determined by the trial court and that certain make-up parenting time still needs to be addressed, we affirm in part and remand.

## Facts and Procedural History

In 2001, Mother and Father were married. Their son, O.W., was born in 2002 and their daughter, A.W., was born in 2004.[1] In 2005, Father was convicted of felony sexual misconduct with a minor stemming from an offense involving Mother's younger sister. Mother and Father then divorced in 2005 and Mother was given primary custody of O.W. and A.W. (the "Children"). Father was allowed visitation and was ordered to pay child support. At some point Father remarried, and Father and his current wife, Brittany Woolridge, have a daughter, L.W., who was two years old at the time of the hearings underlying this appeal.

In December 2011, an agreed entry reflected Mother's and Father's stipulations as to

parenting time arrangements. In the summer of 2012, Mother denied Father parenting time for approximately two months, with his parenting time resuming at the beginning of September 2012. Mother denied Father parenting time based on a belief that Father allowed the Children to visit with his stepfather, Tom Stierwalt. The court has at times restricted or limited Father in taking the Children to Stierwalt's house, based on Father being exposed to inappropriate behavior at the hands of Stierwalt when Father was growing up. In August 2012, Father filed a verified petition to modify a previous court order and a verified petition for citation for contempt. In October 2012, Mother filed a motion for rule to show cause. Mother's and Father's motions were heard in late October 2012.

On November 19, 2012, A.W. told Mother some things that alleged that Father had touched her inappropriately. Mother took A.W. to her mother's ("Grandmother") house where A.W. elaborated on the incidents to Mother and Grandmother and used a doll to explain where she had been touched. Mother called her attorney that day, and the next day took A.W. to the police station and then to the Department of Child Services ("DCS"). Sometime soon thereafter, Mary Deckard, a family case manager ("FCM") with DCS, came to Mother's house and spoke to Mother and the Children. On November 28, 2012, A.W. was interviewed at Susie's Place, a child advocacy center where forensic interviews of possible child victims are conducted. A forensic interviewer, Whitney Mallow, interviewed A.W. while FCM Deckard, Detective Sergeant Downing—a state-certified forensic investigator with the Morgan County Sheriff's Department—and Beth Penn of the Morgan County Prosecutor's Office all observed the interview in a separate room with audio and video feeds.

---

[1] Mother also has another son, C.W.

At the interview, Mallow first asked A.W. if she knew where she was or why she was there. A.W. replied that she knew that Susie's Place was there to help children who had been hurt. As to what they were there to talk about, she said that "my mom says that, um, my dad, he's been touching me in inappropriate parts. He has done that to other peop— to this other person, but he's been doing it to me a lot." Appellant's Brief at 7. A.W. then went on to describe an incident two years before in which she was in her bed at Father's house in the room that she shares with L.W. During the night, someone who she thought could have been Father came in and she felt a big hand pinching and squeezing her private parts though her pajama pants. When asked to clarify, she said that her private parts meant her vagina. After that night-time incident, she said that Father had been "touching my vagina ever since, like on top of clothes . . . like when I'm walking past, he like rubs along it and then he pinches it." Id. at 8. She said that it happened frequently, and it hurt. She talked about Stierwalt pinching and tickling her vagina, bottom, and breast while they were in the living room and family and friends were present. She also indicated that Brittany pinches her bottom but not her "front parts." She claimed that Father's touches happened often, "like, at least every minute," as well as "everywhere" throughout Father's house as well as at other houses and with other people present. She said that Father told her not to tell anyone, and she affirmed that the events she described "really happen[ed]." Id. at 9. When Mallow asked A.W. whether she had any questions after answering so many, A.W. asked, "has this stuff been really wrong?" Id. at 7. When asked what she thought now that she and Mallow had talked about these things, A.W. replied that she hoped she would be safe now, but that she still

4

wanted to go to her Father's house to see her stepsister L.W. A few days after the interview, FCM Deckard visited Father and Brittany at their home and spoke to them about the allegations.

On November 30, 2012, Mother filed a motion to suspend parenting time. In a report dated December 11, 2012, FCM Deckard concluded that A.W. was determined to be safe as "there was no disclosure of specific molest regarding [Father] or others in [Father's] home." Appellant's Appendix at 46. The allegations were determined to be unsubstantiated by DCS, and the report concluded that the Children were safe to visit with Father in his home as scheduled per the parenting time agreement. Mother and FCM Deckard testified that when Deckard told her the allegations had not been substantiated, Deckard also told her that if she had concerns about A.W., then she should do whatever she thought she needed to do as a parent to protect her child.

In December 2012, Father filed a verified petition to modify custody, a petition for rule to show cause, a response to Mother's motion to suspend parenting time, and a motion for emergency hearing. On January 28, 2013, the court issued an order concerning the motions heard in October 2012. Among other things, the court found both Mother and Father to be in contempt of court and sentenced each of them to thirty days in jail suspended, and ordered that Father would continue to have the right to exercise parenting time and that Mother was not allowed to unilaterally withhold parenting time.

On January 29, 2013, the court held a hearing on the emergency motions, and issued an interim parenting time motion that allowed Father parenting time with the condition that it

be supervised.[2] The court continued the hearing on the remaining motions to February 2013. Over two days in February 2013, hearings were held regarding parenting time; the hearing was continued to March 2013 for evidence regarding modification of custody. Witnesses at the hearings included both Mother and Father, Grandmother, FCM Decker, Sergeant Downing, and Terry Eads, who is a mental health provider who had been meeting with A.W. and had also been supervising visits between the Children and Father. On April 4, 2013, the court issued an order on outstanding motions. The court ordered Father's unsupervised parenting time to resume with a transition period over several weeks for Father to return to full weekends of parenting time; ordered A.W. to continue therapy with Eads, with Mother and Father participating as requested by Eads, and with Eads developing a safety plan with A.W.; denied Father's modification of custody request, but expressed concerns about Mother's attempts to limit Father's parenting time and reminded Mother that she had been found in contempt in the court's January 28, 2013 order and that any future failure to comply with parenting time orders would result in the revocation of the suspended sentence; granted Father make-up days for lost parenting time, allowing him to exercise parenting time for the entire 2013 summer break; and found Mother to again be in contempt for failing to comply with parenting time orders, "even after being instructed by [DCS] that it was determined the [C]hildren were safe to visit with Father in his home as scheduled," and ordered Mother to pay $500 of Father's attorney's fees as a result of her contempt. Appellant's App. at 13.

---

[2] Mother had denied Father parenting time after A.W. first made the allegations on November 19, 2012, until this order was issued, at which point Father began supervised parenting time.

On April 5, 2013, Mother filed a motion to stay order, and that same day the court issued an order delaying implementation of parenting time as ordered on April 4. The April 5 order allowed Father to continue supervised parenting time "until such time as the supervising agency provides the Court notice that sessions may become unsupervised"; provided for A.W. to continue with therapeutic counseling and to work toward unsupervised parenting time; reminded Mother and Father that neither may unilaterally stop the therapeutic counseling; and asked both the counselor and supervising agency to file a report with the court within thirty days. Appellant's App. at 14. This appeal followed. Additional facts will be supplied as necessary.

## Discussion and Decision

### I. No Appellee's Brief

When, as here, the appellee does not file a brief, we apply a less stringent standard of review and will reverse the trial court if the appellant establishes prima facie error. State v. C.D., 947 N.E.2d 1018, 1021 (Ind. Ct. App. 2011). "Prima facie" is defined as "at first sight, on first appearance, or on the face of it." Id. This rule is not intended to benefit the appellant, but rather to relieve us of the burden of developing arguments on behalf of the appellee. Id. The burden of demonstrating trial court error remains with the appellant. Id.

### II. Findings of Fact

#### A. Standard of Review

When a court has made findings of fact, we determine whether the evidence supports the trial court's findings and whether those findings support the court's conclusions. Yanoff

v. Muncy, 688 N.E.2d 1259, 1262 (Ind. 1997). We will only set aside findings where they are clearly erroneous—that is, when the record contains no facts to support them either directly or by inference. Id. In order to determine that a finding is clearly erroneous, our review of the evidence must leave us with a firm conviction that a mistake has been made. Id.

### B.  Findings of Facts Regarding A.W.'s Interview

Mother argues that the trial court's findings of fact indicate that it did not review the DVD recording of A.W.'s interview at Susie's Place and further argues that the findings are inaccurate and unsupported by the record.  Mother's main argument focuses on two of the court's findings of fact, points twelve and thirteen, which begin with "Ms. Deckard and Sergeant Downing testified . . . ."  Appellant's Br. at 17.  Mother argues that the "logical inference" is that the court was simply recounting the "largely inaccurate" testimony of the witnesses rather than providing its own assessment. Id. Mother then goes on to give possible interpretations of several of A.W.'s statements.  Mother also argues that, even if these are the court's own findings of fact, they are not supported by the evidence.  For this contention, Mother cites to certain sentences within the court's twelfth and thirteenth findings of fact and notes that the wording is closer to that in FCM Decker's DCS report than to A.W.'s exact wording in the interview.

We first note that while we recognize the seriousness of A.W.'s allegations, we do not reweigh the evidence on appeal. Shady v. Shady, 858 N.E.2d 128, 139 (Ind. Ct. App. 2006), trans. denied.  To the extent that Mother asks us to re-interpret statements from A.W.'s

interview, that is not within the purview of this court. As for Mother's argument that the findings of fact imply that the court did not watch the DVD of A.W.'s interview, that is speculation. We have reviewed the record, including the DVD, and cannot say that the findings of fact are clearly erroneous.[3] Mother does not indicate how the outcome would have been different had the court adopted the findings of fact exactly as Mother suggests. The court order required A.W. to continue with therapy, denied Father's request for modification of custody, and with its order the next day, required that Father's parenting time be supervised. Presumably, Mother would prefer that the court had made more firm findings against Father and denied him all parenting time. However, the record supplies some uncertainties as to A.W.'s allegations and supports the judgment of the court, which seemed to be trying to find a reasonable middle ground.[4] The record reveals that A.W. has remained firm in her allegations, but that DCS, Sergeant Downing, and Eads all question to what extent those allegations are to be believed. That is because of statements that A.W. made in the interview regarding what Mother had told her, the improbability of some of her accusations (such as that Father pinches her vagina all of the time and around other people), and her interactions with Father during supervised parenting time, among other things.

---

[3] We remind the trial court that it must adopt, and not merely reference or quote, the testimony of witnesses for a finding to be considered a finding of the court. See Parks v. Del. Cnty. Dep't of Child Servs., 862 N.E.2d 1275, 1279 (Ind. Ct. App. 2007).

[4] At the end of the January 29 hearing, after which the court ordered supervised parenting time for Father, the court said that it was "trying to reach a compromise solution so that both parties have some assurances that they are being treated fairly, that the [C]hildren are being protected, that [Father's] rights as

### III. Admission of Evidence

#### A. Standard of Review

Whether to admit or exclude evidence is a determination entrusted to the sound discretion of the trial court. Mundy v. Angelicchio, 623 N.E.2d 456, 460 (Ind. Ct. App. 1993). We will reverse the trial court's decision only when it has abused that discretion. Id. An abuse of discretion occurs when the decision is clearly erroneous—that is, against the logic and effect of the facts and circumstances or the reasonable inferences to be drawn therefrom. Id. Regardless of the objection made at trial, if the trial court's exclusion of evidence is supportable, we cannot say the trial court abused its discretion. Id. Moreover, even if an evidentiary decision was an abuse of discretion, we will not reverse if the ruling constituted harmless error. Spaulding v. Harris, 914 N.E.2d 820, 829-30 (Ind. Ct. App. 2009), trans. denied. Where wrongfully excluded testimony is merely cumulative of other evidence, its exclusion is harmless error. Id.

#### B. Evidence Relating to Father's History

At the hearing, Mother attempted to have Grandmother testify as to the behavior of her daughter (Mother's sister) after her daughter had been molested by Father, in order to compare that behavior to A.W.'s behavior. Father objected to the time frame of the testimony as being prior to the last custody order and therefore not relevant to the current proceedings. The court went off record to talk to counsel, and once back on the record Mother stated that she had no more questions.

---

a parent are being preserved, and addressed." Transcript at 29.

Indiana Code section 31-17-2-21(c) provides that, regarding a modification of child custody order, the court "shall not hear evidence on a matter occurring before the last custody proceeding between the parties unless the matter relates to a change in the factors relating to the best interests of the child as described by section 8 . . . ." Mother argues that there was no prior custody proceeding, because custody was originally set in the divorce settlement agreement, and since then parenting time has changed, but custody has not and there have been no hearings involving custody.[5] Mother further argues that, regardless of any prior proceedings, the statute allows the court to hear matters relating to the best interest of the child, and that Grandmother's evidence went to whether Father had molested A.W. and therefore went to factors to be considered when determining the best interest of the child, such as the interaction and interrelationship of the child with her parents. We agree that the testimony was not barred by Indiana Code section 31-17-2-21. However, the trial court has wide discretion in admission and exclusion of evidence, and we conclude that there was no abuse of that discretion here.

Because the court went off the record after Mother's offer of proof following Father's objection, we cannot know what transpired, although the transcript prior to that break indicates that the court agreed with Father that any evidence prior to December 2011 was somewhat off-limits. However, Mother acknowledges that the court did not exclude every mention of Father's history. Rather, the court did not allow testimony regarding evidence predating December 2011, with the exception of evidence that the court had not previously

---

[5] The "last custody order," referenced by Father in his objection seems to refer to the December 2011 agreed entry regarding parenting time; that entry did not address custody.

11

heard. During the hearings, the court did allow testimony regarding events prior to December 2011, over Father's objections, if the evidence had not previously been presented to the court. Additionally, by the time Grandmother testified, the court had already heard testimony from Eads, a professional who had worked with "hundreds" of children regarding sexual misconduct allegations prior to seeing A.W. Tr. at 40. Eads testified that prior to supervising time between A.W. and Father, Eads was leaning in one direction because A.W. was consistent in her story and did not appear to be dishonest, but when she saw A.W. with Father, the "pieces didn't fit at that point" and A.W. "did not represent as the child who had been traumatized in the way that she had said." Id. at 61. While she stressed that it was not her job to conclude whether something had happened, but rather her goal was to help A.W. process her feelings, Eads's testimony was certainly equivocal as to whether A.W.'s behavior indicated that she had been molested. We cannot say that the trial court abused its discretion in declining to admit Grandmother's evidence regarding the behavior of her own child who was molested.

## IV. Contempt

### A. Standard of Review

Whether a party is in contempt is a matter left to the sound discretion of the trial court, and we reverse the trial court's finding of contempt only if it is against the logic and effect of the evidence before it or is contrary to law. Sutton v. Sutton, 773 N.E.2d 289, 297 (Ind. Ct. App. 2002). When reviewing a contempt order, we will neither reweigh the evidence nor judge the credibility of witnesses, and unless after a review of the entire record we have a

12

firm and definite belief a mistake has been made by the trial court, the trial court's judgment will be affirmed.  Id.

### B.  Finding Mother in Contempt

Mother next challenges the court's contempt finding in its April 2013 order.  Mother cites to Williamson v. Creamer for the proposition that if a parent believes a noncustodial parent is molesting their child, the custodial parent must file a petition for modification of parenting time rather than simply withholding parenting time; because Mother did file a petition for modification of parenting time, she argues that she should not be held in contempt.  722 N.E.2d 863, 866 (Ind. Ct. App. 2000).  However, Williamson does not imply that filing a petition for modification allows the parent to then withhold parenting time until the court has made a decision.  In fact, Williamson notes that, "[e]ven if a party contends that an order is erroneous, the order must still be obeyed . . .  A party's remedy for an erroneous order is appeal and disobedience of the order is contempt."  Id. (citation omitted).  While we sympathize with the conundrum of what to do in the interim—after the petition for modification has been filed but before the court has issued an order—in this case it appears that the trial court was mainly concerned with Mother continuing to withhold parenting time after DCS determined that the allegation was unsubstantiated and A.W. was safe to visit Father, rather than with Mother's initial withholding of parenting time before A.W.'s allegations could be investigated.  It is possible that the court also viewed Mother's actions in light of her past attempts to withhold parenting time from Father.  Mother notes that "[c]ounsel is aware of no authority indicating that a DCS report, setting forth its personnel's

conclusions about what is best for a child, constitutes a court order or is in any other way binding upon the parent concerned." Appellant's Br. at 25. We agree that the DCS report was not a court order. However, the gist of the trial court's concern seems to be not that DCS in some way ordered Mother to resume parenting time, but that the <u>court</u> had originally ordered parenting time, and there was nothing in the DCS report that might justify Mother's continued withholding of parenting time. We conclude that the trial court did not abuse its discretion in finding Mother in contempt.

## V. Delegation of Authority to Determine Supervision

Mother also argues that the court erred in delegating to a supervising agency the authority to determine when Father's parenting time would become unsupervised. We agree. Mother cites to <u>In re Paternity of A.R.R.</u>, which interpreted a statute providing that the court may modify an order granting or denying visitation rights. 634 N.E.2d 786, 789 (Ind. Ct. App. 1994) ("[A] modification of visitation may not be granted absent a determination by the court that the modification would serve the best interests of the child. No statute permits this determination to be delegated to a caseworker, probation officer, guardian, or other authority, and to do so would be to undermine the safeguards inherent in reserving to a detached and impartial court the task of weighing the many considerations relevant to visitation."); <u>see also</u> <u>In re Marriage of Stephens</u>, 810 N.W.2d 523, 530 n.3 (Iowa Ct. App. 2012) (citing cases in other jurisdictions agreeing that the court may not delegate to third parties its judicial power to determine visitation or custody). A similar provision is now codified at Indiana Code section 31-17-4-2. Ind. Code § 31-17-4-2 ("The court may modify an order granting or

14

denying parenting time rights whenever modification would serve the best interests of the child."). While the court will likely rely upon the opinion of the supervising agency and therapist, the ultimate decision of when and how to modify parenting time is in the hands of the trial court and may not be delegated. We remand for the trial court to revise its order.

## VI. Parenting Time

Mother also requests that we vacate the trial court's award of make-up parenting time. Mother notes that the order allowed the make-up time during the summer 2013 school break that has since passed, suggests that the order is now moot, and argues that, considering the errors complained of in this appeal, any make-up time was premature.[6] We disagree that the question of make-up time is moot, and given our conclusions on Mother's other issues, we cannot say that such a determination was premature. We remand to the trial court to re-evaluate make-up parenting time.

Finally, Mother requests that we remand for the trial court to reassess payment for supervised parenting time. The court originally ordered Mother to pay the costs of the supervised parenting time because she was "infinitely more comfortable with the supervised parenting time right now," and because Father's income was "very, very limited" but the court noted that it would consider payment at the final adjudication. Tr. at 238-39. As a significant period of time has passed since the court's April orders, which had Mother continuing to pay the costs of A.W.'s therapy with Eads—presumably to include Eads's

---

[6] Mother implies that Father never had make-up parenting time during the 2013 summer, likely because of the court's April 5 order maintaining Father on supervised parenting time.

15

supervision of parenting time—it would be appropriate on remand for the trial court to re-evaluate the parties' situations and who should best pay for supervised parenting time.

Conclusion

Concluding that the trial court did not err as to its findings of fact or abuse its discretion as to admission of evidence or finding Mother in contempt, but that the court did err in delegating the authority to modify parenting time and that certain make-up parenting time and payment of supervision needs to be addressed, we affirm in part and remand.

Affirmed in part and remanded.

RILEY, J., and KIRSCH, J., concur.