**In the Matter of the Involuntary Termination of Parent–Child Relationship of C.G., minor child, and Her Mother, Z.G.**

**Z.G. (Mother), Appellant–Respondent,**

**v.**

**Marion County Department of Child Services, Appellee–Petitioner.**

**and**

**Child Advocates, Inc., Co–Appellee (Guardian Ad Litem).**

No. 49A04–1002–JT–75.

Court of Appeals of Indiana.

Aug. 26, 2010.

Kimberly A. Jackson, Indianapolis, IN, Attorney for Appellant.

Shari L. Vanderploeg, Department of Child Services, Indianapolis, IN, Robert J. Henke, Indiana DCS Central Administration, Indianapolis, IN, Attorneys for Appellee.

## OPINION

VAIDIK, Judge.

### Case Summary

Z.G. ("Mother") appeals the involuntary termination of her parental rights to her child, C.G. She argues that the Indiana Department of Child Services, Marion County ("DCS"), and the trial court deprived her of due process, the trial court abused its discretion by excluding certain evidence, and the evidence is insufficient to support the trial court's judgment. Concluding that Mother's due process rights were not violated, that the trial court did not commit reversible error in the exclusion of evidence, and that DCS presented clear and convincing evidence to support the trial court's judgment, we affirm.

### Facts and Procedural History

Mother is the biological mother of C.G., born in December 2000.[1] In January 2008 Mother went to Utah and left C.G. in Indianapolis in the care of Faustino Leyvas, Mother's boyfriend. During her visit to Utah, Mother was arrested. The United States subsequently filed an indictment against Mother in the United States District Court for the Southern District of Indiana alleging that Mother had committed conspiracy to possess five kilograms or more of cocaine with intent to distribute.

After her arrest, Mother was incarcerated in Utah until she was transferred back to Indiana in April 2008. While she was incarcerated in Utah, Mother contacted Leyvas and asked him to take C.G. to Chauna Ordower, a neighbor who lives in Indianapolis. Ordower is not related to C.G. by blood or marriage. C.G. lived with Ordower from January 2008 until mid-April 2008. Mother could not contact C.G. or Ordower during that time because

Mother did not know Ordower's mailing address.

Leyvas picked up C.G. from Ordower's home immediately following Easter and took C.G. with him on a trip. Leyvas and C.G. were gone for five to seven days. When they returned on April 16, 2008, Leyvas left C.G. with one of Ordower's neighbors. Ordower retrieved her from the neighbor's home within a few hours of C.G.'s return. C.G. told Ordower that she did not feel good and that "her privates" hurt. Tr. p. 359. Ordower took C.G. to the hospital that same day, where doctors determined that C.G. had herpes and had been sexually abused.

Hospital staff contacted DCS about C.G. DCS sent Case Manager Stacey Madden to the hospital to investigate. After C.G. was released from the hospital, DCS placed her in foster care. C.G. has remained in foster care with the same family since then.

Case Manager Madden learned from Ordower that Mother had been arrested in Utah. Case Manager Madden attempted to find Mother by contacting two county jails in Utah and by checking with the Marion County Jail, the Indiana Department of Correction, DCS databases, and the local telephone directory, but she was unsuccessful. Unknown to DCS, on April 11, 2008, Mother was transferred from Utah to the custody of the United States Marshal's Office for the Southern District of Indiana ("the Marshal"). The Marshal incarcerated Mother at the Henderson County Jail in Kentucky pending trial.

On April 18, 2008, DCS filed a petition alleging that C.G. was a child in need of services ("CHINS"). A court in the Marion Superior Court, Juvenile Division ("the

---

1. Mother did not identify C.G.'s father until the final hearing in this case, so he is not a party to these proceedings. Mother has a younger child, Z.M., who was born on July 29, 2005. Z.M. is not involved in this case.

CHINS court"), held an initial hearing. The CHINS court appointed a guardian *ad litem* ("GAL") for C.G. and ordered that C.G. would remain in the custody of DCS. The CHINS court noted that the plan for permanency was to reunify C.G. with her parent(s).

On April 30, 2008, DCS filed with the trial court a Praecipe for Service by Publication, seeking leave to give Mother notice by publication of the CHINS case. DCS attached to the Praecipe an Affidavit of Diligent Inquiry that was signed by Case Manager Madden and explained the steps she had taken to locate Mother.

Shortly thereafter, Case Manager Madden left DCS, and C.G.'s case was reassigned to Case Manager Michael Davis. Case Manager Davis tried to locate Mother by checking the same sources that Case Manager Madden had consulted, but he was unsuccessful.

In May and June 2008, DCS again filed Praecipes for Service by Publication with the CHINS court. DCS attached to each Praecipe an Affidavit of Diligent Inquiry, signed by Case Manager Davis, in which he explained the steps he had taken to locate Mother. The CHINS court scheduled a default dispositional hearing and directed DCS to publish notice of the hearing.

On August 6, 2008, the CHINS court held a default dispositional hearing. DCS was present, but Mother had not yet been found, and no GAL attended the hearing. The CHINS court heard testimony. Subsequently, the CHINS court issued a dispositional order formally removing C.G. from Mother's care and making C.G. a ward of DCS. In the dispositional order, the CHINS court further stated that no services would be offered to Mother "until she appears before the Court." Ex. Vol. II, p. 169. At that time, the permanency plan for C.G. remained reunification with her parent(s).

Meanwhile, Mother, who had remained in jail in Kentucky since April 2008, made inquiries among friends and discovered in September 2008 that DCS had custody of C.G. In October 2008 Mother sent a letter to DCS. Case Manager Davis received the letter in November 2008. He sent a letter back to Mother in December 2008. Mother sent DCS two more letters, one in December 2008, and another in February 2009. After receiving Mother's letters, DCS sent Mother an advisement of rights and a copy of the CHINS petition.

On March 16, 2009, Case Manager Davis met with his supervisors, and they agreed to seek the CHINS court's permission to change the permanency plan for C.G. from reunification with Mother to adoption by the foster parents. On March 25, 2009, the CHINS court held a hearing and authorized DCS to change C.G.'s permanency plan. On that same day, DCS filed a petition to terminate the parent-child relationship of Mother and C.G., beginning this case.

On April 7, 2009, DCS filed with the CHINS court a Notice indicating that Mother requested a public defender. The CHINS court appointed counsel for Mother, who subsequently filed an appearance in the CHINS proceedings.

Meanwhile, in the current termination case, Mother also obtained counsel. The trial court scheduled a final hearing on termination. Mother filed a request for a continuance of that hearing. On August 24, 2009, the trial court granted the continuance and rescheduled the final termination hearing for November 5, 2009.

On November 4, 2009, Mother requested another continuance of the final termination hearing. The trial court granted Mother's motion and rescheduled the hear-

ing for November 19, 2009, but determined that there would be no further continuances. Next, Mother filed motions to be transported to the hearing, to participate by teleconferencing, to participate telephonically, and for a sixty-day continuance. The trial court granted Mother's request to participate in the hearing by telephone and denied all other requests.

On the day before the November 19, 2009, hearing, Mother filed a motion to bifurcate the fact-finding hearing to allow Mother's witnesses to testify thirty days later. During the hearing, Mother renewed her request for a continuance, which the trial court denied. However, the trial court granted Mother's motion to bifurcate and scheduled the second day of the hearing for January 4, 2010.

Subsequently, Mother filed a motion to be transported to court for the second day of the hearing. The trial court denied Mother's request.

Mother participated in both days of the final termination hearing telephonically, with translators in the courtroom translating the proceedings for Mother because she does not speak or understand English. Mother was represented by counsel on both days. During the hearing, Mother testified that she had been found guilty in her federal criminal case. She asserted that her sentencing hearing had not yet been held, but she could serve anywhere from ten years to life for her conviction.

On January 11, 2010, the trial court issued findings and conclusions terminating the parent-child relationship between Mother and C.G. Appellant's App. p. 15. In its conclusions, the trial court determined, in relevant part:

2. [DCS] has proved by clear and convincing evidence that there is a reasonable probability that conditions that resulted in [C.G.'s] removal and continued placement outside the home will not be remedied by [Mother], in that [Mother] will remain incarcerated during most, if not all, of [C.G.'s] minority years.

3. [DCS] has proved by clear and convincing evidence that the continuation of the parent-child relationship poses a threat to the well-being of [C.G.] because of [Mother's] unavailability to provide necessities and parenting, and for [C.G.'s] need for permanency as soon as possible.

4. [DCS] has proved by clear and convincing evidence that termination is in the best interests of [C.G.] to provide the opportunity to be adopted into a loving permanent home where her needs will be met.

5. [DCS] has proved by clear and convincing evidence that there is a satisfactory plan for the care and treatment of [C.G.], that being adoption by her current foster parents.

*Id.* at 17–18. Mother now appeals.

## Discussion and Decision

Mother contends that DCS and the trial court deprived her of due process, the trial court abused its discretion by excluding certain evidence, and the evidence is insufficient to support the trial court's judgment.

### I. Due Process

Mother asserts that DCS and the trial court each violated her right to due process. The Due Process Clause of the Fourteenth Amendment to the United States Constitution prohibits state action that deprives a person of life, liberty, or property without a fair proceeding. *In re C.C.,* 788 N.E.2d 847, 852 (Ind.Ct.App. 2003), *trans. denied.* When the State seeks to terminate the parent-child relationship, it must do so in a manner that meets the requirements of due process.

*Id.* The nature of the process due in a termination of parental rights proceeding turns on the balancing of three factors: (1) the private interests affected by the proceeding, (2) the risk of error created by the State's chosen procedure, and (3) the countervailing governmental interest supporting use of the challenged procedure. *Id.*

In this case, both the private interests and the countervailing governmental interests that are affected by the proceeding are substantial. In particular, the action concerns a parent's interest in the care, custody, and control of her child, which has been recognized as one of the most valued relationships in our culture. *Id.* Moreover, it is well settled that the right to raise one's child is an essential, basic right that is more precious than property rights. *Id.* As such, a parent's interest in the accuracy and justice of the decision is commanding. *Id.* On the other hand, the State's *parens patriae* interest in protecting the welfare of a child is also significant. *Id.* Delays in the adjudication of a case impose significant costs upon the functions of government as well as an intangible cost to the life of the child involved. *Id.* Because both parties have substantial interests in the proceeding, we will focus our review on the third factor, which is the risk of error created by DCS's actions and the trial court's actions.

## A. DCS

Mother raises several allegations of due process violations by DCS in the CHINS and termination proceedings. Mother contends that DCS staff did not diligently search for her before asking the CHINS court to permit service upon Mother by publication. Mother further asserts that a reasonable search would have resulted in DCS locating Mother in Kentucky and providing her with constitutionally adequate notice of the CHINS proceeding.

Ordower told Case Manger Madden that Mother had been arrested in Utah on a federal charge. Consequently, DCS reported to the CHINS court at the April 2008 initial hearing that Mother was incarcerated in a facility in Utah awaiting trial on a federal offense. Case Manager Madden looked for Mother by contacting two county jails in Utah, each of which reported that Mother was not in custody. Case Manager Madden also checked with the Marion County Jail and the Indiana Department of Correction. She also searched ICES and ICWIS, which are two databases maintained by DCS. Finally, Case Manager Madden also looked in the local telephone directory. All of these efforts were unsuccessful. After Case Manager Davis took over the case, he also searched for Mother at the two county jails in Utah as well as the Marion County Jail and the Indiana Department of Correction. Case Manager Davis also searched ICES and ICWIS and the local telephone directory. The case managers each executed Affidavits of Diligent Inquiry describing their efforts to the CHINS court. Madden and Davis had no reason to believe that Mother was in the Marshal's custody or that she was incarcerated in a Kentucky jail. At that time, there was no centralized national database to search for people who were incarcerated on federal charges.

We conclude that any error in DCS's failure to locate Mother during the CHINS case did not substantially increase the risk of error in the termination proceedings. Mother does not state what steps she would have taken in the CHINS case if she had received notice of the proceedings earlier than she did. Furthermore, Mother was incarcerated at the time of the CHINS proceedings and could not have

received services from DCS. Finally, Mother was represented by counsel in the termination action, who cross-examined witnesses at the final hearing and presented evidence on Mother's behalf. Consequently, DCS's failure to locate Mother during the CHINS case did not violate her due process rights. *See Hite v. Vanderburgh Office of Family & Children*, 845 N.E.2d 175, 184 (Ind.Ct.App.2006) (determining that a father was not denied due process by failing to receive notice of initial CHINS proceedings because he was heard in later portions of the CHINS proceedings and in the termination action, and he was incarcerated at the time).

Nevertheless, Mother notes that Case Manager Davis's Affidavit of Diligent Inquiry, which DCS filed with the CHINS court when DCS requested leave to serve notice upon Mother by publication, contained an inaccuracy. Specifically, in the Affidavit, Case Manager Davis stated that he had asked "family acquaintances regarding the parent's whereabouts." Ex. Vol. II, p. 176. In fact, he did not talk to any acquaintances. Tr. p. 492. At the termination hearing, Case Manager Davis's excuse for the inaccuracy was that he used a form to generate the Affidavit, and the statement regarding contacting acquaintances had already been "populated" in the form and could not be deleted. *Id.* Case Manager Davis's attitude toward executing a sworn affidavit is troubling, but we cannot conclude that his inaccuracy substantially increased the error in the termination proceedings. At the time Case Manager Davis executed the Affidavit, Ordower was Mother's only known acquaintance. Case Manager Davis did not have Ordower's contact information, and in any event, Ordower did not know where Mother could be found. Therefore, if Case Manager Davis had questioned Ordower, it would not have changed the outcome of the CHINS proceedings. In addition, it is unclear how Case Manager Davis's falsehood in his Affidavit affected the termination proceedings. Mother cross-examined Case Manager Davis on this issue during the termination hearing, which allowed the trial court to assess any impact Case Manager Davis's inaccuracy had on his credibility. Furthermore, Mother was incarcerated at the time Case Manager Davis issued the Affidavit, and it is unclear what services she could have received that would have altered the outcome of the CHINS or termination proceedings.

Next, Mother asserts that after she contacted DCS, DCS failed to give her timely notice of her rights in the CHINS case, which deprived her of an opportunity to defend herself. The CHINS court issued a default dispositional CHINS decree against Mother on August 6, 2008. In November 2008 Case Manager Davis received a letter from Mother, which was the first communication he had received from her. Case Manager Davis sent Mother a response in December 2008. In his letter to Mother, Case Manager Davis did not tell her a CHINS case was pending. Instead, he asked Mother when she would be released and what was her "plan in regards to [C.G.] and you parenting your daughter[.]" Ex. Vol. I, p. 66. Case Manager Davis further stated that there "are legal procedures that go along with this case which can lead to termination of parental rights." *Id.* Subsequently, Mother sent DCS two more letters, one in December 2008 and one in February 2009. DCS sent Mother an advisement of rights form and a copy of the CHINS petition only after receiving the February 2009 letter. Mother requested counsel at that time. Within a month of mailing Mother her advisement of rights, DCS filed its petition for termination. Mother did not receive counsel in the CHINS action until after DCS filed the petition for termination.

■ These facts give cause for concern. DCS's delay in sending Mother a copy of the CHINS petition and an advisement of rights effectively precluded Mother from participating in the CHINS case in its later stages and cannot be condoned. Nevertheless, we cannot conclude that DCS's dilatory behavior substantially increased the risk of error in the termination proceedings. Mother does not state what steps she would have taken in the CHINS proceeding had she received the CHINS documents and the assistance of counsel earlier. Furthermore, Mother was incarcerated during the CHINS proceeding and could not have received services. Finally, Mother was present and represented by counsel at the termination hearing, at which time Mother's counsel questioned Case Manager Davis about his communications with Mother, and Mother presented her version of events. We cannot say that DCS's failure to timely serve Mother with a copy of the CHINS petition and an advisement of rights constituted a deprivation of due process. *See Castro v. State Office of Family & Children,* 842 N.E.2d 367, 375 (Ind.Ct.App.2006) (determining that an agency's failure to timely notify a parent of a child's removal from the home did not violate the parent's right to due process because the parent was incarcerated, the parent did not explain how earlier notification would have changed the result of the CHINS or termination proceedings, and the agency had a strong interest in removing the child from an unsuitable home), *trans. denied.*

■ Mother also contends that DCS violated her due process rights by failing to place C.G. with other individuals instead of with foster parents while the CHINS and termination cases were pending. We disagree. Before considering any other out-of-home placement, DCS is required to consider placing a child with a "suitable and willing blood or an adoptive relative caretaker, [a] de facto custodian . . . or . . . stepparent." Ind.Code § 31-34-4-2. Here, Mother asserts that DCS could have placed C.G. with: (1) Chauna Ordower, who was willing to continue caring for C.G.; (2) Candy Duran, who lived with Mother's brother in Utah and had two children with him but was not married to him; or (3) a Mr. Martinez, who lives in Kentucky and became Mother's boyfriend after her relationship with Leyvas ended. Ordower, Duran, and Martinez are not related to C.G. by blood or adoption, and none of them are C.G.'s stepparents.[2] Furthermore, for purposes of Indiana Code section 31-34-4-2, a "de facto custodian" is a "person who has been the primary caregiver for, and financial support of, a child who has resided with the person for at least: (1) six (6) months if the child is less than three (3) years of age; or (2) one (1) year if the child is at least three (3) years of age." Ind.Code § 31-9-2-35.5. In this case, C.G. was more than three years of age when she stayed with Ordower, and she only stayed with Ordower for three months. C.G. has never lived with Duran or Martinez. Consequently, Ordower, Duran, and Martinez did not qualify as de facto custodians when DCS took custody of C.G. For these reasons, DCS was not obligated to consider placement of C.G. with any of them during the CHINS and termination proceedings.

■ Mother further asserts that an aunt of C.G. who lived in Mexico had contacted DCS, and DCS should have sent

2. Mother argues in her reply brief that pursuant to Utah statute, Duran was the common law wife of Mother's brother and DCS was obligated to consider placement of C.G. with Duran as a relative. An argument raised for the first time in a reply brief is waived. *Gordon v. Purdue Univ.,* 862 N.E.2d 1244, 1250 (Ind.Ct.App.2007).

C.G. to Mexico to live with the aunt. However, when the aunt contacted Case Manager Davis, she wanted him to put C.G. on a plane to Mexico. When Case Manager Davis explained that he could not do that and outlined the steps she would need to follow to take custody of C.G., the aunt was unwilling to proceed. Thus, DCS did not err by failing to pursue placement of C.G. with the aunt.

Mother notes that DCS still had discretion to consider placing C.G. with Ordower, Duran, Martinez, or the aunt in Mexico even if DCS was not obligated by statute to pursue such placement, but we cannot say that DCS's failure to do so substantially increased the risk of error in the termination proceedings. Mother asserts that she could have stayed in touch with C.G. through those individuals if C.G. had been placed with any of them, but this assertion is questionable. Mother could not contact Ordower while C.G. was staying with Ordower. In addition, Duran testified that she could have helped C.G. maintain telephonic contact with Mother, but Duran is in the United States illegally and could be deported at any time, thereby hindering communication with Mother as well as disrupting C.G.'s home life. There is no evidence as to how Martinez or C.G.'s aunt in Mexico would have helped C.G. maintain contact with Mother. Thus, Mother was not deprived of due process by DCS's failure to pursue placing C.G. with Ordower, Duran, Martinez, or C.G.'s aunt in Mexico.

■ Next, Mother contends that DCS deprived her of due process by not reporting C.G.'s molestation to law enforcement. This contention is incorrect. Case Manager Davis testified that contacting law enforcement would have been the job of the investigatory case manager. Case Manager Madden, who first handled C.G.'s case, typically contacted law enforcement in cases where a child was a crime victim, but she did not remember if she referred C.G.'s case to law enforcement. Consequently, DCS could have fulfilled its statutory obligation to report child abuse to law enforcement, and the record does not reflect that DCS failed to act. *See* Ind.Code § 31–33–7–5. We remind Mother that when reviewing a termination of parental rights, we consider only the evidence and reasonable inferences therefrom that are most favorable to the judgment. *Doe v. Daviess County Div. of Children & Family Servs.*, 669 N.E.2d 192, 194 (Ind.Ct.App. 1996), *trans. denied.* Furthermore, if DCS had not reported C.G.'s case to law enforcement, such a failure to act would be disturbing, but it is unclear how such an event would have deprived Mother of her due process rights in the termination case.

■ Finally, Mother argues that DCS infringed upon her right to due process by referring C.G. to a therapist who was not trained in addressing sexual abuse. We disagree. C.G.'s foster parents wanted C.G. to work with a faith-based counselor, so Case Manager Davis referred C.G. to Ranada Dalton, a therapist who at that time worked at the Christian Theological Seminary Counseling Center. The purpose of the counseling was to address four subjects: C.G.'s abandonment issues, insecurity, low self-esteem, and sexual abuse. Dalton holds a Master of Arts in Marriage and Family Therapy and works with families and children. Dalton has no specific training in counseling child victims of sexual abuse. Nevertheless, Dalton has worked with C.G. on abandonment issues, insecurity, and low self-esteem. C.G. has not yet wanted to talk with Dalton about the sexual abuse, but Dalton testified that she will pursue it with C.G. at an appropriate time. Dalton testified that if she determines that she is not qualified to work with C.G. on sexual abuse issues, she will refer C.G. to another therapist. Thus, it

appears that C.G. is receiving adequate counseling services. Furthermore, Mother has failed to demonstrate how the provision of counseling services to C.G. affects her right to due process of law in the CHINS or termination proceedings.

For these reasons, we conclude that DCS did not deprive Mother of due process during the CHINS or termination proceedings.

### B. Trial Court Rulings

██ Mother raises several due process challenges to trial court decisions in the termination proceeding. First, she argues that the trial court erred by denying her requests to attend the termination hearing in person and by ordering her to participate telephonically instead. Mother explains that the trial court erroneously declined to allow her to come to the Marion Superior Court, Juvenile Division's facilities at the Juvenile Center pursuant to a policy enacted by the Marion Superior Court. At the termination hearing, witnesses testified that the Marion County Sheriff's Department has a policy that juvenile prisoners cannot be within sight or hearing of adult prisoners, and the Marion Superior Court, Juvenile Division, lacks the facilities to separately house adult and juvenile offenders at the Juvenile Center. Consequently, due to lack of space, the Superior Court issued a blanket policy that prevents adult inmates from participating in person in proceedings at the Juvenile Center. Mother contends that participating by telephone hindered her ability to understand the proceedings and communicate with counsel, thereby depriving her of due process.

██ We are troubled by the Marion Superior Court's policy. As the evidence at the hearing shows, there are other Marion County courts with the capacity to hold adult prisoners, and those could be used in termination proceedings when necessary.

We can foresee circumstances under which an incarcerated parent's in-person participation in a termination proceeding would be necessary, and the Marion Superior Court's policy could deprive parents of their right to due process in those circumstances. Nevertheless, in this case, we determine that Mother's due process rights were not significantly compromised by her telephonic participation in the final hearing. Mother was represented by counsel, who cross-examined witnesses and submitted evidence. Furthermore, Mother testified during the hearing, and on the second day of the hearing Mother was able to authenticate exhibits that her counsel had sent her. Finally, we observe that a parent does not have a constitutional right to be present at a termination hearing. *C.C.*, 788 N.E.2d at 853. Consequently, the challenged procedure created only a minimal risk of error in this case, and we conclude that the trial court's denial of Mother's request to attend the hearing did not deprive her of due process of law. *See In re E.E.*, 853 N.E.2d 1037, 1044 (Ind.Ct. App.2006) (determining that the trial court did not deprive a parent of due process by proceeding with a termination hearing in the parent's absence because the parent's counsel participated in the hearing and the parent did not have a right to be present), *trans. denied.*

██ Mother also argues that the trial court deprived her of due process by denying her motions for continuance on the day before the hearing and on the first and second days of the hearing. Mother contends that the trial court's denial of her motions deprived her of opportunities to meaningfully consult with her attorney. Mother further states that the denial of her request for a continuance on the second day of the hearing deprived her of a chance to review the transcript from the

first day of the hearing, which would have helped her to prepare a defense.

We conclude that the trial court's denials of Mother's requests for continuances did not increase the risk for error. Counsel for Mother entered her appearance in the termination case five months before the first day of the final termination hearing. By the time the final hearing began, the trial court had already allowed Mother two continuances. On November 4, 2009, in the order granting Mother's second requested continuance, the trial court had warned Mother that no further continuances would be granted. Furthermore, Mother's counsel vigorously cross-examined DCS's witnesses on both days of the hearing and introduced evidence in defense of the action. Finally, Mother testified on both days of the hearing, so her version of events was presented to the trial court. Under these circumstances, the risk of an inaccurate result decreases significantly. *See In re E.D.*, 902 N.E.2d 316, 322 (Ind.Ct.App.2009) (determining that the denial of a parent's request to continue a final termination hearing did not violate the parent's due process rights where the parent was present telephonically and the parent's counsel had the opportunity to cross-examine witnesses and introduce evidence), *trans. denied.* We conclude that the trial court's denial of Mother's requests for continuances did not deprive her of due process.

After balancing the substantial interest of Mother with that of the State and in light of the minimal risk of error created by the challenged procedures, we conclude that DCS and the trial court did not deny Mother due process of law.

## II. Exclusion of Evidence

Mother contends that the trial court erred by excluding evidence regarding permanent dispositions for C.G. other than termination of the parent-child relationship.

The admission of evidence is entrusted to the sound discretion of the trial court. *In re A.J.*, 877 N.E.2d 805, 813 (Ind.Ct.App.2007), *trans. denied.* We will find an abuse of discretion only where the trial court's decision is against the logic and effect of the facts and circumstances before the court. *Id.*

Mother first contends that the trial court erred by sustaining a DCS objection to a question she asked Case Manager Davis. Mother asked, "And so you didn't feel you had any obligation to look for relatives, correct? Yes or no." Tr. p. 225. DCS objected, and the trial court sustained DCS's objection on grounds that the question was repetitive. Mother contends that the question was not repetitive. We disagree. Earlier in the hearing, while questioning Case Manager Davis about an exhibit, Mother asked him the following questions:

Q: Okay, I see the name and address of an individual. Did you go find that individual?

A: Well, it's not up to me to go and find that individual. It's up for the...

 \* \* \*

Q: Okay, you don't have to go find anybody, right?

A: Not necessarily.

*Id.* at 211. Mother also had the following exchange with Case Manager Davis during the hearing:

Q: Alright. Do you routinely try to find relatives to place children with?

A: Yes, if we have relatives that come forward or if we have any names of relatives.

*Id.* at 220. Thus, Mother had already asked Davis several times about his obli-

gation to look for relatives or other appropriate persons with whom to place C.G., and the question at issue was repetitive. The trial court did not abuse its discretion by sustaining DCS's objection to Mother's third question on the subject.

Next, Mother argues that the trial court erred by limiting testimony from Chauna Ordower and Candy Duran regarding their capabilities to care for C.G. Mother contends that Ordower's and Duran's testimony was relevant and admissible. Specifically, Mother states that Ordower's and Duran's additional testimony was relevant to the determination of whether DCS's permanent plan for C.G. was satisfactory because the testimony would have shown that alternative placements for C.G. were available that would have allowed Mother and C.G. to remain in contact.

Relevant evidence is "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Ind. Evidence Rule 401. Mother is correct that DCS was obligated to allege and prove that there is a satisfactory plan for the care and treatment of C.G. *See* Ind.Code § 31–35–2–4. This plan need not be detailed, so long as it offers a general sense of the direction in which the child will be going after the parent-child relationship is terminated. *In re D.D.*, 804 N.E.2d 258, 268 (Ind.Ct.App.2004), *trans. denied.*

In this case, DCS demonstrated at the termination hearing that its permanency plan for C.G. was adoption by her foster parents. Neither Ordower's nor Duran's testimony questioned the fitness of the foster parents to adopt C.G. or tended to prove that C.G. would do poorly if adopted by the foster parents. We conclude that Ordower's and Duran's testimony about

their respective capabilities to host C.G. and maintain a relationship between Mother and C.G. was irrelevant to the question of whether DCS had a satisfactory permanency plan for C.G. Consequently, the trial court did not abuse its discretion by excluding Ordower's and Duran's testimony on this issue. *See Matter of M.B.*, 638 N.E.2d 804, 808 (Ind.Ct.App.1994) (determining that DCS was not obligated to make a showing of attempted reunification of a child with a parent in order to demonstrate that a satisfactory plan for the child existed), *trans. denied.*

Nevertheless, even if Ordower's and Duran's testimony was relevant and should have been admitted, we will not reverse an evidentiary ruling if the ruling constituted harmless error. *Spaulding v. Harris*, 914 N.E.2d 820, 829–30 (Ind.Ct. App.2009), *reh'g denied, trans. denied.* An error is harmless if it does not affect the substantial rights of the parties. *Id.* at 830. Where wrongfully excluded evidence is merely cumulative of other evidence presented, its exclusion is harmless error. *Id.*

In this case, Duran was allowed to testify that she works and supports her own children, lives in her own home, and would have been willing to take care of C.G. Duran further testified that she would have arranged for C.G. to have phone conversations with Mother. Ordower was allowed to testify at length about how she took care of C.G. before C.G. became a ward of DCS, including buying C.G. her own bed, clothing, and toys, and assisting C.G. with her homework. Ordower also testified that she works, supports her own children, and would have been willing to continue caring for C.G. This evidence sufficiently demonstrates Duran's and Ordower's capabilities to take care of C.G., and any additional evidence they would have submitted on this point would have been cumulative. Consequently, any error

in the limitation of Duran's and Ordower's testimony was harmless.

In summary, we find no reversible error in the trial court's decision to exclude the testimony discussed above.

### III. Sufficiency of the Evidence

 This Court has long had a highly deferential standard of review in cases concerning the termination of parental rights. *In re K.S.,* 750 N.E.2d 832, 836 (Ind.Ct.App.2001). When reviewing the termination of parental rights, we will not reweigh the evidence or judge the credibility of the witnesses. *D.D.,* 804 N.E.2d at 265. Instead, we consider only the evidence and reasonable inferences that are most favorable to the judgment. *Id.* Moreover, in deference to the trial court's unique position to assess the evidence, we will set aside the court's judgment terminating a parent-child relationship only if it is clearly erroneous. *In re L.S.,* 717 N.E.2d 204, 208 (Ind.Ct.App.1999), *reh'g denied, trans. denied.* If the evidence and inferences support the trial court's decision, we must affirm. *Id.*

 Here, in ordering the termination of the parent-child relationship between Mother and C.G., the trial court entered specific findings. We will not set aside the specific findings unless they are shown to be clearly erroneous. *In re B.D.J.,* 728 N.E.2d 195, 199 (Ind.Ct.App. 2000). A finding is clearly erroneous where there are no facts or inferences drawn therefrom that support it. *In re A.B.,* 888 N.E.2d 231, 235 (Ind.Ct.App. 2008), *trans. denied.* If the evidence and inferences support the trial court's decision, we must affirm. *L.S.,* 717 N.E.2d at 208.

 The traditional right of parents to establish a home and raise their children is protected by the Fourteenth Amendment of the United States Constitution. *In re M.B.,* 666 N.E.2d 73, 76 (Ind. Ct.App.1996), *trans. denied.* A trial court must subordinate the interests of the parent to those of the child, however, when evaluating the circumstances surrounding a termination. *K.S.,* 750 N.E.2d at 837. Thus, parental rights are of a constitutional dimension, but the law provides for the termination of those rights when a parent is unable or unwilling to meet his or her parental responsibilities. *Id.* at 836.

 When seeking an involuntary termination of parental rights, the State is required to allege and prove, among other elements, that:

> (B) there is a reasonable probability that:
>> (i) the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied; or
>> (ii) the continuation of the parent-child relationship poses a threat to the well-being of the child; [and]
> (C) that termination is in the best interests of the child; and
> (D) that there is a satisfactory plan for the care and treatment of the child.

Ind.Code § 31–35–2–4(b).[3] The State must establish each of these allegations by clear and convincing evidence. *In re A.B.,* 888 N.E.2d at 236.

 Mother challenges the evidence that supports several of the trial court's findings of fact. She first challenges the trial court's Finding No. 3,[4] which states,

---

**3.** Indiana Code section 31–35–2–4 was amended by Pub.L. No. 21–2010, § 8 (effective March 12, 2010). Because the changes to the statute became effective following the filing of the termination petition herein, they are not applicable to this case.

**4.** Mother erroneously identifies this finding of fact as "Finding of Fact No. 2," but her

"A diligent inquiry to find and serve Mother was made to no avail, and service of the CHINS action was made upon her by publication." Appellant's App. p. 16. Mother contends that DCS made only minimal efforts to find her. We disagree. Case Manager Madden, who had been told that Mother had been arrested in Utah on federal charges, contacted two county jails in Utah and did not find her. By the time Case Manager Madden performed her search, Mother had been placed in the Marshal's custody and jailed in Kentucky, but Case Manager Madden had no reason to know or suspect that Mother had been placed in the Marshal's custody or jailed in Kentucky. Nevertheless, Case Manager Madden also checked with the Marion County Jail, the Indiana Department of Correction, two DCS databases, and the local phone directory, all to no avail. When Case Manager Davis took over C.G.'s case, he also checked the Utah county jails. Case Manager Davis, like Case Manager Madden, had no reason to know or suspect that Mother had been placed in the Marshal's custody or jailed in Kentucky. Case Manager Davis also checked with the Marion County Jail, the Indiana Department of Correction, two DCS databases, and the local phone directory, all to no avail. This evidence is sufficient to support the trial court's finding.

Mother again points out that Case Manager Davis was less than truthful in his Affidavit of Diligent Inquiry. Specifically, he asserted in the Affidavit that he had contacted family acquaintances when, in fact, he had not. As we noted above, Case Manager Davis did not have Ordower's contact information, and even if he did have Ordower's contact information, Ordower did not know where Mother was. Consequently, Case Manager Davis's inaccuracy, although troubling, does not cause

us to disregard the other steps he took to attempt to locate Mother.

Next, Mother contends that the trial court's Finding No. 7 is not supported by sufficient evidence. The trial court found, "Mother sent two more letters to [DCS] with names of possible placement for [C.G.]. By this time, [C.G.] was in an appropriate foster home and relatives who were contacted were not interested in going through the process for placement." *Id.* The trial court's finding appears to refer to C.G.'s aunt who lived in Mexico. Mother correctly notes that the aunt called Case Manager Davis, so that portion of the trial court's finding of fact is unsupported by the evidence. Nevertheless, the trial court's error is harmless because the record substantially supports the most crucial part of the factual finding, which is that the aunt was not interested in going through the process for placement. When Case Manager Davis spoke with the aunt and explained that she would need to come to Indianapolis and undergo a background check and other procedures, she was unwilling to proceed. Mother's assertion that Case Manager Davis should have pursued the aunt more aggressively is a request to reweigh the evidence, which we cannot do. Despite the trial court's harmless error, sufficient evidence supports Finding No. 7.

Mother also contends that the evidence does not support the trial court's Finding No. 9, in which the trial court stated, "Mother thinks she will be sentenced to ten (10) years of incarceration." *Id.* We disagree. When asked about the sentence for her conviction, Mother stated, "They told me it was ten years for conspiracy." Tr. p. 125. She later repeated, "I was told that I could be there for ten years for conspiracy." *Id.* at 466. Mother cor-

rectly notes that she also testified that she does not know how long her sentence will be, but these statements, taken together, establish that to the best of Mother's knowledge she will serve at least ten years. Thus, the record supports the trial court's finding as to Mother's estimate of her possible sentence.

■ Next, Mother challenges the trial court's findings addressing C.G.'s therapy. The trial court found as follows:

12. [C.G.] is currently in therapy, working on four issues: 1) processing her sexual abuse, 2) abandonment by her mother, 3) insecurity and 4) adjustment in her current placement.

13. [C.G.] has made much progress on issues with the exception of the sexual abuse, an issue that she is not ready to address but needs to be in the future.

14. [C.G.] has been placed with foster parents since April 2008, and the foster parents are willing to adopt her. [C.G.'s] needs are being met, including most importantly, her need for continued therapy.

Appellant's App. p. 16. Mother contends that C.G.'s therapeutic needs are not being met because C.G.'s therapist, Dalton, is unqualified to work on child sexual abuse issues. We disagree. Dalton testified to limited experience in working with child sex abuse victims, but she also stated that she did not think that C.G.'s current therapeutic needs were greater than she could address. She also stated that if she came to believe that C.G.'s therapeutic needs were beyond her ability to address, she would refer C.G. to someone else. Mother also argues that it is unclear that Dalton would continue to see C.G., but Dalton testified that she planned to continue working with C.G. This evidence supports the trial court's findings that C.G.'s therapeutic needs are being met.

■ Finally, Mother challenges the trial court's Finding No. 18. The trial court found:

18. Termination of the parent-child relationship is in [C.G.'s] best interests. Reunification is not possible. Termination, providing the opportunity for a subsequent adoption, would accomplish the goal for [C.G.] to be granted a permanent home in a loving and stable environment, where she has integrated and bonded, and will have her physical and therapeutic needs met. It would be harmful to [C.G.] if she were removed from her current placement, and could set her back in her therapy. It is not disputed that Mother loves her daughter. However, Mother is unavailable to parent and [C.G.'s] interests in moving forward toward permanency are tantamount to Mother's parental rights being left in tact [sic].

*Id.* at 17.

■ Mother contends that the evidence does not demonstrate that termination of the parent-child relationship is in C.G.'s best interests. We are mindful that in determining what is in the best interests of the child, the court is required to look beyond the factors identified by DCS and look to the totality of the evidence. *McBride v. Monroe County Office of Family & Children,* 798 N.E.2d 185, 203 (Ind. Ct.App.2003). In addition, this Court has previously determined that the testimony of a child's guardian *ad litem* regarding the child's need for permanency supports a finding that termination is in the child's best interests. *Id.*

In this case, Case Manager Davis stated that it was not in C.G.'s best interests to give Mother more time to attempt reunifi-

cation. He further noted that termination is in C.G.'s best interests because C.G. had bonded with her pre-adoptive foster family. Furthermore, Case Manager Davis stated that keeping C.G. in foster care until Mother got out of prison would not provide her with a sense of permanency.

In addition, C.G.'s guardian *ad litem,* Lindsay Hakes, testified that C.G. needs permanency and that her pre-adoptive foster home can provide that permanency. GAL Hakes further stated that if C.G. knew that her foster home would be her permanent home, "it would ease some uncertainty and anxiety within her." Tr. p. 270. In addition, GAL Hakes testified that C.G. was comfortable in her foster home and was "very bonded" with her foster mother. *Id.* at 266.

The testimony of Case Manager Davis and GAL Hakes supports the trial court's factual finding that termination of the parent-child relationship is in C.G.'s best interests. Mother's contention that Duran or Ordower could have provided more suitable homes because they would have allowed C.G. and Mother to maintain contact during Mother's imprisonment is nothing more than a request to reweigh the evidence, which we cannot do.

Finally, Mother also argues that Finding No. 18 is erroneous because there is no evidence that removing C.G. from her current placement would harm C.G. or set her back in her therapy. To the contrary, Mother argues that placement with a relative or Ordower would be better in the long term. We disagree. GAL Hakes stated that "it would be absolutely devastating" to remove C.G. from her foster parents' care. *Id.* at 269. C.G.'s therapist, Dalton, stated that if C.G. was removed from her pre-adoptive foster home, "it could possibly be very difficult for her emotionally. It's a possibility that the abandonment issues could come up more."

*Id.* at 94. This evidence is sufficient to support the trial court's finding of fact.

A thorough review of the record reveals that the trial court's judgment terminating Mother's parental rights to C.G. is supported by clear and convincing evidence.

Affirmed.

MAY, J., and ROBB, J., concur.