## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Jul 17 2019, 10:36 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Andrew J. Sickmann
Boston Bever Klinge Cross & Chidester
Richmond, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Katherine A. Cornelius
Robert J. Henke
Deputy Attorneys General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

In the Matter of the Termination of the Parent-Child Relationship of L.F.,[1] Father, and L.S., Minor Child,

L.F.,

*Appellant-Respondent,*

v.

July 17, 2019

Court of Appeals Case No.
18A-JT-2882

Appeal from the
Union Circuit Court

The Honorable
Matthew R. Cox, Judge

Trial Court Cause No.
81C01-1802-JT-13

---

[1] We note that, while the parental rights of Mother, A.S., and Father were terminated during the same juvenile court hearing, the parties elected to file separate appeals. The termination of Mother's parental rights was affirmed by this court in *L.S. v. Indiana Department of Child Services*, No. 18A-JT-2881, 2019 WL 2181225 (Ind. Ct. App. May 21, 2019). Because the two appeals arise from the same facts and the same order, and raise some of the same issues, much of our analysis mirrors analysis in that opinion.

Indiana Department of Child
Services,

*Appellee-Petitioner.*

**Kirsch, Judge.**

[1] L.F. ("Father") appeals the juvenile court's order terminating his parent-child relationship with his minor child, L.S. ("Child"), raising the following consolidated and restated issue: whether the juvenile court's order terminating his parental rights was supported by sufficient evidence.

[2] We affirm.

## Facts and Procedural History

[3] Child was born on October 28, 2015, with cocaine and benzodiazepines in her system, and she was experiencing withdrawal symptoms. *Appellant's App. Vol. II* at 7. The following day, the Indiana Department of Child Services ("DCS") filed a petition alleging that Child was a child in need of services ("CHINS"). *Id.* On October 30, 2015, the CHINS court conducted an Initial/Detention Hearing, during which Mother admitted the allegations in the CHINS petition, including that she used illicit substances resulting in Child experiencing withdrawal symptoms at birth. Mother was uncertain about the identity of

Child's father. *Id.* at 10. Child was in the hospital at the time of the hearing, and the juvenile court ordered relative placement upon Child's discharge. *Id.* at 11. Following the hearing, the CHINS court found sufficient evidence that Child was a CHINS and, citing the best interests of Child, removed Child from Mother's care. *Id.* at 10-11.

### *CHINS Proceedings*

[4] At the December 15, 2015 Dispositional Hearing, the CHINS court ordered Mother to participate in various services and comply with all recommendations with the goal of reunification with Child. *Id.* at 13-15. In March 2016, the CHINS court held a hearing for Periodic Case Review. *Id.* at 17-18. In its order issued after the hearing, the CHINS court described the services DCS had offered Mother and the ways in which Mother had failed to comply with those services. *Id.* The CHINS court also noted that although Mother had given DCS the name of a possible father, Mother provided no other identifying information. *Id.* at 18. It was not until October 19, 2016 that DCS received the results of a paternity test, showing that Father was Child's biological father. *Tr. Vol. 3* at 11.

[5] On April 11, 2017, Father participated in an Initial Hearing regarding Child being a CHINS. Father admitted Child was a CHINS based upon, *inter alia*, Mother's use of illicit substances and Child experiencing withdrawal symptoms from that drug use. Father conceded that he was Child's biological father and admitted he had not maintained contact with Child during the CHINS proceedings. *Appellant's App. Vol. II* at 20, 32.

[6] On May 3, 2017, following an April 25 hearing, the CHINS court entered a Dispositional Order as to Father, requiring him to complete certain services and comply with certain conditions, with the goal of reunification with Child. Those services and conditions, in pertinent part, required Father to: contact the family case manager ("FCM") weekly; allow DCS to make unannounced visits to Father's home; enroll in recommended programs within thirty days and participate without missing appointments; if required, complete assessments within thirty days; keep all appointments with service providers; maintain suitable, safe, and stable housing; secure and maintain a stable source of income; refrain from using, manufacturing, trading, or selling illegal, controlled substances; obey the law; complete and follow the recommendations of a parenting assessment and substance abuse assessment; submit to random drug screens; attend scheduled visitations with Child; and participate in the Father Engagement program as recommended by service providers. *Id.* at 23-24. The Dispositional Order also stated, "Any request for drug screen that is not completed in a timely manner will result in a positive result indication." *Id.* at 24.

[7] Around that time, DCS FCM Sherry McClain ("FCM McClain") gave Father referrals for substance abuse assessment, random drug screens, Father Engagement Program, and visitation. *Tr. Vol. 3* at 15. One referral, which was made to Meridian Services for both parents, was cancelled by Meridian due to the parents missing appointments and because Father lived in Oxford, Ohio. *Id.* For that reason, a referral for substance abuse assessment was made to the

Community Mental Health Center ("CMHC"), which was located within a half-hour's drive of Oxford. *Id*. at 62.

[8] On June 13, 2017, Father was present at a CHINS Periodic Case Review hearing. As to Father, the CHINS court found the following facts and made the following orders: (1) Father did not comply with Child's case plan; (2) Father had referrals for substance abuse assessment and treatment, random drug screens, case management, and supervised visitation but had not begun any treatment as of the date of the hearing; (3) Father submitted to three drug screens in April and May of 2017, two of which were positive for cocaine; (4) Father did not cooperate with DCS; (5) Father was not forthcoming with DCS about where he lived, saying he lived in Hamilton, Ohio, when he actually lived with Mother in Oxford, Ohio; and (6) the reason for the out-of-home placement or supervision had not been alleviated. *DCS Ex.* 12; *Appellant's App. Vol. II* at 34-35. The CHINS court also recognized that visits with Child had been "suspended at the hearing on April 25, 2017 for both parents. However, neither parent had been visiting with [C]hild prior to the suspension of visits during the reporting period." *DCS Ex.* 12.

[9] On October 10, 2017, the CHINS court held a hearing on the permanency plan. *DCS Ex.* 13. Although Father did not appear, the CHINS court found: (1) Child was "progressing well" in relative placement; (2) Father had been offered a substance abuse assessment through the CMHC in Brookville, Indiana, located within a half-hour's drive of Oxford, Ohio, but had not appeared at the facility to complete an assessment; (3) Father had not complied with Child's

case plan; (4) Father submitted to three drug screens and tested positive for cocaine once in May and once in June 2017; and (5) Father refused to submit to drug screens in July and September 2017. Father's two refusals to submit to drug screens were, under the terms of his Dispositional Order, deemed to be positive screens. *Appellant's App. Vol. II* at 24. The CHINS court ordered Child's permanency plan to be changed to reunification with a concurrent plan of termination of the parent-child relationship and adoption for Child. *Id*. at 35.

[10] On March 13, 2018, ten months after entering its Dispositional Order for Father, the CHINS court held a Review and Modification of Disposition hearing. The CHINS court found: (1) Father had not complied with Child's case plan; (2) Father had been offered substance abuse treatment but had not complied with that treatment; (3) Redwood Toxicology suspended its random drug screens due to Father's non-compliance; (4) Father submitted to a drug screen on June 16, 2017 that was positive for cocaine; (5) Father had not fulfilled his parental obligations to Child; (6) Father had not complied with DCS instructions; and (7) the cause for Child's out of home placement had not been alleviated. *DCS Ex*. 14. The CHINS court ordered, "Mother and Father are not to have visitation until the parents have engaged in substance abuse treatment and produce random drug screen results that are free from illicit substances." *Id*. DCS asked the CHINS court for permission to stop offering Mother and Father reunification services, but the CHINS court required DCS to continue to provide services to both parents. *Id*.

## Termination Proceedings

[11] Meanwhile, on February 15, 2018, DCS had filed a petition to terminate Father's parent-child relationship with Child. On May 2 and June 5, 2018, the juvenile court held a fact-finding hearing on the termination petition, and FCM McClain and Court Appointed Special Advocate Linda Taylor ("CASA Taylor"), among others, testified. FCM McClain testified that, once Child was adjudicated a CHINS as to Father, the CHINS court ordered Father to participate in services, including drug screens and substance abuse assessment, and, thereafter, the CHINS court held review hearings and a permanency hearing to monitor Father's progress. *Tr. Vol. 3* at 7. DCS introduced into evidence the CHINS court's orders from those hearings as DCS Exhibits 2 through 14.

[12] Over Father's objection, DCS offered into evidence DCS Exhibit 15, which was the affidavit of Bridget Lemberg ("Lemberg"), the laboratory director of Forensic Fluids Laboratories, Inc. *DCS Ex.* 15. In the affidavit, Lemberg detailed the laboratory's procedures and stated that those procedures were followed when Father submitted to drug screens on April 11, 2017 and May 3, 2017. *Id.* Both lab reports were attached to Lemberg's affidavit and showed that Father had tested positive for the presence of cocaine. *Id.* Father objected to the admission of Exhibit 15, arguing that the test results were unreliable and that the forensic lab technician was not present to testify. *Id.* DCS countered that the lab reports could be admitted because they met the requirements of the

business records exception to the rule against hearsay. *Tr. Vol. 3* at 28-30. The juvenile court ruled:

> Uh, on the issue of the, uh, drug screens being admitted into evidence. The Court will take the matter under advisement but will proceed as if they are admitted into evidence. So any subsequent testimony regarding drug screens will be allowed. If I determine that they are not admissible, then that . . . testimony will be stricken from the record. If I determine they are admissible, then the evidence submitted, uh, for their testimony will be admitted.

*Id.* at 34.

[13]    FCM McClain explained that DCS referred Father to the following services: substance abuse assessment; random drug screens; and participation in the Father Engagement program. *Id*. at 52. Although Father was initially allowed visitation with Child, FCM McClain stated that Father had minimal visits with Child. *Id*. at 39. During one of the visits, FCM McClain observed that Child was very uncomfortable; she engaged with Father a little but then retreated to FCM McClain's lap. *Id*. at 51. When Father picked up Child to kiss her goodbye, Child cried and pushed Father away. *Id.*

[14]    For Father's convenience, DCS moved Father's mental health referral to CMHC, which was in Indiana but less than a half-hour's drive from Oxford. *Id*. at 62. In September 2017, Father attended a supervised visit with Child at CMHC. *Id*. at 59. After the meeting, FCM McClain asked Father to submit to a drug screen. Father refused, saying CMHC had screened him just the day

before. *Id.* FCM McClain spoke with CMHC and learned that, contrary to Father's assertion, he had not submitted to a screen the previous day. *Id.* Although Father went to CMHC for visitation, he never went there to participate in his required mental health assessment. *Id.* at 81-82. Father's visits were suspended based on non-compliance with the substance abuse assessment, and the CHINS court required that Father have two months of clean drug screens before visitation would be reinstated. *Id.* at 56, 59. Father never complied. *Id.* at 61.

[15] FCM McClain said that DCS had communicated with Redwood, a service provider in Oxford, who had agreed to meet Father at a location of his choice so that he could participate in the Father Engagement program; FCM McClain stated that Father did not contact Redwood or complete Father Engagement. *Id.* at 60, 61. FCM McClain was unsure about Mother's and Father's housing but stated that they had lived together "for a good while" at a motel in Oxford, Ohio. *Id.* at 39, 57.

[16] FCM McClain testified that Child was two-and-a-half years old at the time of the hearing, did not know her parents, and "ha[d] been basically raised by the maternal grandmother and the maternal aunt." *Id.* at 39. FCM McClain also testified that Child "is very bonded to her maternal aunt and her family" and "needs stability and permanency, and they are who she knows." *Id.* at 37. FCM McClain also observed, "The parents have not completed any of the treatment, [the] referrals that they were asked to complete." *Id.* She also stated that the case started in October 2015 and, as of the date of the hearing, almost

three years later, nothing had been completed successfully. *Id*. She maintained that, after Father's rights were terminated, the permanency plan was to have Child adopted by her "current placement." *Id*. at 37-38. FCM McClain concluded that it was in the best interest of Child to have her parent-child relationship with Father terminated and remain with her maternal aunt. *Id*. at 37.

[17] CASA Taylor testified that she represented Child's best interests. When asked if she had any concern about the parents, CASA Taylor questioned parents' ability to provide appropriate care and supervision for Child. *Id*. at 65. CASA Taylor testified that, from her interaction with parents, she knows "they've not been [in] compliance with Court orders." *Id*. Furthermore, it was her observation that "Child doesn't even know these parents as parents." *Id*. When asked about specific concerns concerning Father, CASA Taylor said she worried about Father's cocaine use. *Tr. Vol. III* at 67. CASA Taylor also expressed the following concern:

> [Father and Mother] have always been together, as far as I can determine during this two-and-a-half years of, uh, placement for [Child], and yet he didn't come forward until . . . October [2016] when mother named him as the father. There was a whole year he went without acknowledging his child. And so I'm wondering now why is he coming forward?

*Id*. CASA Taylor shared her concern about Mother's and Father's ability to meet Child's needs. *Id*. CASA Taylor, like FCM McClain, believed that for the two-and-a-half years that Child has been in relative care, she has developed

a bond with her caregivers. *Id.* The CASA concluded that it was not in Child's best interests to remove her from the family she has known and put her into a "risky situation" that may or may not work. *Id.* CASA Taylor concluded, "It's my belief that it's in the best interests of [Child] to have . . . the parents' rights terminated." *Id.*

[18] Father testified that he was present when Child was born. *Tr. Vol. 4* at 5. In fact, Father claimed that he helped deliver Child in Mother's home when she was unable to make it to the hospital in time. *Id.* Father testified that when Mother and Child were transferred to the hospital, he followed the ambulance. *Id.* at 6. Once released from the hospital, Child was placed "in the relative's home, which was down the road from where [Mother] was living at the time." *Id.* at 7. Even though paternity had not been established, Father said he visited Child two or three times a week. *Id.* Father testified that he was visiting Child because he thought she might be his child. *Id.* In June 2017, four months before the paternity test established Father's paternity, Father thought Child was his. *Id.* at 8. Mother was concerned that Father was going to get custody of Child and prevent Mother from visiting. Explaining he was able to see Child in relative placement, Father said he and Mother had "an understanding" that he would not pursue his rights as a father. *Id.* at 7-8. Following the fact-finding hearing, the juvenile court terminated Father's parental rights to Child. Father now appeals.

# Discussion and Decision

[19] As our Supreme Court has observed, "Decisions to terminate parental rights are among the most difficult our trial courts are called upon to make. They are also among the most fact-sensitive - so we review them with great deference to the trial courts[.]" *In re E.M.*, 4 N.E.3d 636, 640 (Ind. 2014). While the Fourteenth Amendment to the United States Constitution protects the traditional right of a parent to establish a home and raise his child, and parental rights are of a constitutional dimension, we may terminate those rights when a parent is unable or unwilling to meet his responsibilities as a parent. *K.T.K. v. Ind. Dep't of Child Servs., Dearborn Cty. Office*, 989 N.E.2d 1225, 1230 (Ind. 2013).

[20] Parental rights are not absolute and must be subordinated to the child's best interests in determining the appropriate disposition of a petition to terminate the parent-child relationship. *Id.*; *In re J.C.*, 994 N.E.2d 278, 283 (Ind. Ct. App. 2013)*.* The purpose of terminating parental rights is not to punish the parent but to protect the child. *Z.B. v. Ind. Dep't of Child Servs.*, 108 N.E.3d 895, 902 (Ind. Ct. App. 2018), *trans. denied*. The juvenile court need not wait until the child is irreversibly harmed, such that her physical, mental, and social development is permanently impaired, before terminating the parent-child relationship. *Id.* at 903.

[21] When reviewing a termination of parental rights, we will not reweigh the evidence or judge the credibility of the witnesses. *Id.* at 900. Instead, we consider only the evidence and reasonable inferences that are most favorable to

the judgment. *In re H.L.*, 915 N.E.2d 145, 149 (Ind. Ct. App. 2009). Where, like here, the juvenile court entered specific findings and conclusions, we apply a two-tiered standard of review. *In re B.J.*, 879 N.E.2d 7, 14 (Ind. Ct. App. 2008), *trans. denied*. First, we determine whether the evidence supports the findings, and second, we determine whether the findings support the judgment. *Id*. Moreover, in deference to the trial court's unique position to assess the evidence, we will not set aside the court's judgment terminating a parent-child relationship unless it is clearly erroneous. *In re H.L.*, 915 N.E.2d at 148-49. A finding is clearly erroneous only when the record contains no facts or inferences that support the finding. *In re B.J.*, 879 N.E.2d at 14. If the evidence and inferences support the trial court's decision, we must affirm. *A.D.S. v. Ind. Dep't of Child Servs.*, 987 N.E.2d 1150, 1156 (Ind. Ct. App. 2013), *trans. denied.*

[22] Before an involuntary termination of parental rights may occur, the State is required to allege and prove, among other things:

> (A) that one (1) of the following is true:
>
>> (i) The child has been removed from the parent for at least six (6) months under a dispositional decree.
>
> . . . .
>
> (B) that one (1) of the following is true:
>
>> (i) There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for

placement outside the home of the parents will not be remedied.

(ii) There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.

(iii) The child has, on two (2) separate occasions, been adjudicated a child in need of services;

(C) that termination is in the best interests of the child; and

(D) that there is a satisfactory plan for the care and treatment of the child.

Ind. Code § 31-35-2-4(b)(2). DCS must prove the alleged circumstances by clear and convincing evidence. *In re H.L.*, 915 N.E.2d at 149. If the juvenile court finds that the allegations in a petition are true, it shall terminate the parent-child relationship. Ind. Code § 31-35-2-8(a).

[23] Here, Father does not contest the juvenile court's conclusions that: (1) Child has been removed from Father's care for at least six months under a dispositional order; (2) the termination is in the best interests of Child; and (3) adoption is a satisfactory plan for the care and treatment of Child. Instead, Father argues that there is not clear and convincing evidence that there is a reasonable probability that the conditions resulting in Child's removal will not be remedied. Father challenges the juvenile court's following findings of fact as being unsupported by the evidence:

19.  On or about August 31, 2016, October 12, 2016, and May 3, 2017, Mother submitted to drug screens, and the results were positive for cocaine.

20.  On or about April 11, 2017 and May 3, 2017, Father submitted to drug screens, and the results were positive for cocaine.

21.  Mother did not complete services through Meridian, and around January 2017 Meridian ended services for Mother due to non-compliance.

22.  Father's referral for substance abuse treatment through Meridian ended due to noncompliance.

23.  DCS made a referral for services for the parents through CMHC around June or July 2017, but the parents did not complete services.

. . . .

27.  Mother and Father have a history of using illicit substances, but the parents have not completed the recommended services in order to address their illicit substance use.

*Appellant's App. Vol. II* at 36.

### *Findings 19, 20, and 21*

Father first challenges Findings 19 and 21.  However, we need not determine whether Findings 19 and 21 are supported by the evidence because those two findings pertain to Mother only; the juvenile court could not have relied on

those findings to terminate Father's parental rights. In Finding 20, the juvenile court found that Father participated in one drug screen in April and one in May 2017, and the results of each test was positive for cocaine. *Id*. at 36. Finding 20 was supported by evidence of the drug screen reports that were attached to Lemberg's affidavit in Exhibit 15. Father argues that these reports should not have been admitted under the business records exception to the rule against hearsay. Assuming without deciding that the juvenile court erred in admitting Exhibit 15 and in using that evidence to support Finding 20, the error was harmless. As we explain in our analysis of Finding 27 below, even without Finding 20, there was clear and convincing evidence of Father's drug use to establish that there is a reasonable probability that the conditions resulting in Child's removal from Father and Mother will not be remedied.

### Findings 22 and 23

Father next contends that there was insufficient evidence to support the juvenile court's findings that he failed to complete services through Meridian and CMHC. *Appellant's Br*. at 15. Regarding Finding 22, Father maintains that it was not non-compliance that closed the Meridian services; instead, Meridian closed its services for Father because he lived out of state. FCM McClain testified that she referred Father to Meridian for a "new substance abuse assessment and outpatient treatment" in the early part of May 2017. *Tr. Vol. 3* at 15, 16. FCM McClain testified that Mother and Meridian went back and forth trying to get an appointment that both she and Father could attend. *Id*. After a couple of months had passed without an appointment being made,

Meridian closed the referral around June or July 2017, citing "two reasons": (1) "they missed appointments"; and (2) Mother and Father "were living in Ohio." *Id.* Here, while we agree that living out of state played a large part in Meridian's decision to close Father's referral, based on FCM McClain's testimony, we find there was sufficient evidence for the juvenile court to find that non-compliance was also a factor in the closure of Father's Meridian referral.

[26] In July 2017, FCM McClain, in consultation with parents, referred Father to CMHC. That referral was to ensure that Father had a substance abuse assessment. *Id.* The parents agreed "that CMHC would be better for them, um, that it was a little bit closer and would be easier for them." *Id.*at 16. That referral for Father was still in place at the time of the May 2, 2018 termination hearing. *Tr. Vol. 3* at 16.

[27] Father contends that there was insufficient evidence to support Finding 23, which stated that Father did not complete services with CMHC. As support for his claim, Father argues that he lived in Ohio throughout the underlying CHINS proceedings, sought services in Ohio, yet never received any support in securing such services. *Id.* He contends that, notwithstanding DCS's ability to offer services in Ohio, he was never provided services there. *Id.* Finally, Father asserts that he had transportation issues that prevented him from traveling from Ohio to CMHC in Indiana. *Id.* Father made these same arguments to the juvenile court, and the court found them unpersuasive. Father's arguments are invitations for us to reweigh the evidence and judge the credibility of witnesses,

which we cannot do.  *See In re D.D.*, 804 N.E.2d 258, 265 (Ind. Ct. App. 2004), *trans. denied*.  Furthermore, Father's arguments do not undermine the juvenile court's finding that he did not complete services at CMHC.  Instead, they are excuses as to why he did not complete services and tacit admissions that Father, in fact, did not complete the required mental health services.  This evidence supports the juvenile court's finding of fact regarding Father's non-compliance with services.

### *Finding 27*

[28]  Finally, Father contends that there was insufficient evidence to support a finding that (1) he has a history of using illicit substances; and (2) did not complete the recommended services in order to address that issue.  *Appellant's Br.* at 16.  In support of his argument, Father directs our attention, in part, to DCS Exhibit 15's drug screen results, which were admitted into evidence over his hearsay objection.  Father contends that the juvenile court erred in admitting the drug screen and that, without Exhibit 15, the juvenile court lacked a factual basis for Finding 27.  Assuming, without deciding, that it was error for the juvenile court to introduce DCS Exhibit 15 under the business records exception to the rule against hearsay, we conclude that it was harmless error.[2]  An error will be found harmless if its probable impact, in light of all of

---

[2] During the same hearing on the termination of Mother's parental rights, DCS offered into evidence two substantially identical affidavits with attached drug screens reflecting that Mother tested positive for cocaine.  *L.S.*, No. 18A-JT-2881, at *2.  Mother objected, but DCS argued that the evidence, while arguably hearsay, was admissible under the business records exception to the rule excluding hearsay.  *Id*.  The juvenile court did not rule on Mother's objection, and her parental rights were terminated.  On appeal, a panel of this court

the evidence in the case, is sufficiently minor so as not to affect the substantial rights of the parties. *In re C.G.*, 933 N.E.2d 494, 508 (Ind. Ct. App. 2010), *aff'd*, 954 N.E.2d 910 (Ind. 2011).

[29] As discussed above, Father did not complete his drug assessment at CMHC. Father's claims that transportation was unavailable and that DCS failed to provide services in Ohio are mere excuses; they do not undermine the juvenile court's finding that Father did not complete his required drug assessment. Furthermore, even without the admission of DCS Exhibit 15's drug screens, we find sufficient evidence that Father had a history of drug abuse. The orders of the CHINS court, which were admitted into evidence without Father's objection, reveal that the CHINS court included in the terms of his Disposition Order that Father refrain from substance abuse. The CHINS court also required Father to submit to a drug abuse assessment and participate in random drug screens. Under the terms of the Dispositional Order, Father's two refusals to submit to a drug screen constituted positive drug screens.

[30] Father's visitation with Child was suspended because of Father's drug use and his failure to submit to drug screens. The CHINS court required Father to have two clean drug screens before it would reinstate visitation. The ball was in Father's court; Father could have stopped taking drugs, tested negative for drugs on his drug screens, and again had visitation with Child. Father had the

found that the evidence did not fall within the business records hearsay exception. *Id*. at *4. Accordingly, our court found that the juvenile court erred in admitting this evidence but that the error was harmless. *Id*.

power to restart the visitation; however, he did not submit to future drug screens. We find this was sufficient evidence for the juvenile court to find that Father had a history of substance abuse.

[31] In sum, sufficient evidence supported the juvenile court's findings and its conclusions that there is a reasonable probability that Father will not remedy the conditions resulting in Child's removal. The juvenile court's termination of Father's parent-child relationship with Child was not clearly erroneous.

[32] Affirmed.

Vaidik, C.J., and Altice, J., concur.