## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Jul 12 2016, 8:25 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Brandon E. Murphy
Public Defender's Office
Muncie, Indiana

ATTORNEYS FOR APPELLEE

Gregory F. Zoeller
Attorney General of Indiana

Eric P. Babbs
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

Regina N. Miller,

*Appellant-Defendant,*

*v.*

State of Indiana,

*Appellee-Plaintiff.*

July 12, 2016

Court of Appeals Case No.
18A02-1511-CR-1938

Appeal from the Delaware Circuit Court

The Hon. Linda Ralu Wolf, Judge

Trial Court Cause No. 18C03-1112-FC-41

**Bradford, Judge.**

# Case Summary

[1]     In early December of 2011, Appellant-Defendant Regina Miller was in a relationship with Terry Rutledge.  On the morning of December 2, 2011,

Rutledge met up with Tonia Ingram, and the duo were later videotaped together on a city bus, at a Walmart store, and at a Target store, with the last recording occurring at around 1:00 p.m. Meanwhile, Miller had gone to work and, at around 3:30 p.m., received a text message from Rutledge indicating that he needed help and wanted Miller to secure a truck.

[2] That evening, Rutledge, Miller, and Miller's friend Erin Harman went out. During the early morning of December 3, 2011, Antowyn Warren met Rutledge at a bar in Muncie. A little after 3:00 a.m., Rutledge, Miller, and Warren returned to Miller's house, where Ingram's dead body lay in the basement. Ingram had died of asphyxia from neck compression. The trio moved Ingram's body upstairs.

[3] At approximately 7:45 a.m., Muncie Police were dispatched to the scene of Ingram's body on fire alongside the road. At approximately 10:00 a.m., Miller sent a text message to Kayleigh Rowe, her son's girlfriend who had spent the night at Miller's, telling her to leave and come to Miller's friend's house. Miller told Rowe when she arrived that Rutledge and three other men had killed a woman in Miller's basement. At approximately 11:00 a.m., Miller arrived at Muncie City Hall and spoke with police. Miller admitted to police that she had helped Rutledge transport, dispose of, and burn Ingram's body.

[4] Appellee-Plaintiff the State of Indiana charged Miller with Class C felony assisting a criminal and Class D felony obstruction of justice. Over the next couple of years, both the State and Miller moved for several continuances. In

November of 2014, Miller moved for discharge pursuant to Indiana Rule of Criminal Procedure 4, which the trial court denied. This court declined to accept jurisdiction over Miller's interlocutory appeal. In September of 2015, a jury trial was held. During trial, the trial court admitted several text messages sent or received by mobile telephones connected with Miller. After the trial court quashed Miller's subpoena of Rutledge, Miller offered a police officer's testimony that Rutledge had told him that he had threatened to harm Miller if she did not help dispose of Ingram's body. The trial court instructed the jury on Miller's defenses of duress and necessity, which nonetheless found Miller guilty as charged. Miller contends that the trial court erred in denying her motion for discharge, failed to comply with relevant statutes in quashing her subpoena of Rutledge, and abused its discretion in admitting certain text messages. Miller also contends that her convictions for assisting a criminal and obstruction of justice violate prohibitions against double jeopardy. Because we find Miller's double jeopardy argument to have merit, we affirm in part, reverse in part, and remand with instructions.

# Facts and Procedural History

## I. Facts of the Crimes

In the fall of 2011, Miller rented a house on North Hackely Street in Muncie and was involved in a relationship with Rutledge. Miller's son was in a relationship with Rowe. On the morning of December 2, 2011, Rutledge met up with Ingram, and the duo were videotaped together on a city bus, at a

Walmart store, and at a Target store, with the last recording occurring at 1:11 p.m. Meanwhile, Miller had gone to work at a diner and was expecting to leave work around 6:00 p.m.

[6] At approximately 7:00 to 7:30 p.m., Miller, Harman, and Rutledge were at Miller's house, planning on going out for the evening. During the early morning hours of December 3, 2011, Warren met Rutledge at a Muncie bar, where an employee also saw Miller at approximately 2:45 a.m. At approximately 3:00 a.m., Harman saw Miller getting into her vehicle with Rutledge.

[7] Miller, Rutledge, and Warren ended up back at Miller's house. The trio went downstairs to the basement, where Ingram's dead body lay, and moved it upstairs. Miller helped Rutledge to clip Ingram's fingernails, partially strip Ingram's body, wrap it in plastic, load it into an SUV that Miller had borrowed, and drive around in search of a place to dispose of the body. At approximately 7:45 a.m., Muncie Police were dispatched to the intersection of Gavin and Bunch Roads, where Ingram's body was on fire. It was determined that Ingram had suffered some trauma to her head but had died of asphyxiation due to neck compression.

[8] At approximately 10:00 a.m., Miller sent a text message to Rowe, who had spent the night at Miller's house, demanding that she leave and come over to Miller's friend's house. When Rowe arrived at the friend's house, Miller told her that Rutledge and three other men had killed a women in her basement.

Miller also told Rowe that Rutledge had told her, "this is what happens when b****** talk[.]" Tr. p. 431.

[9] At approximately 11:00 a.m., Miller arrived at City Hall to speak with police. Miller admitted to police that she had helped Rutledge clip Ingram's fingernails, partially strip Ingram's body, wrap it in plastic, load it into the SUV, drive around in search of a place to dispose of the body, and drive Rutledge to the BMW Club to dispose of some bloody clothing. Police collected from Miller a pair of rubber gloves and a sweatshirt with blood on the sleeves. DNA collected from the items matched Ingram's or had a major profile which matched that of Ingram's. Fingernail clippings found in the basement of Miller's home and material collected from a rubber glove found in the kitchen matched Ingram's DNA profile. A purse found in a trash tote in front of Miller's house contained personal belongings of Ingram, including an identification card.

## II. Procedural History

[10] On December 9, 2011, the State charged Miller with Class C felony assisting a criminal and Class D felony obstruction of justice. On March 2, 2012, the State moved for a continuance on the ground that certain evidence was not yet available, and the trial court rescheduled the jury trial for August 6, 2012. On July 19, 2012, the State moved for a continuance on the ground that the deputy prosecutor was unavailable on August 6, 2012, and the trial court rescheduled trial for November 13, 2012.

On November 1, 2012, Miller moved for a continuance, and trial was rescheduled for March 18, 2013. On January 16, 2013, Miller moved for a continuance, and trial was rescheduled for June 3, 2013. On May 14, 2013, Miller moved for a continuance, and trial was rescheduled for November 18, 2013. On August 30, 2013, Miller moved for a continuance, and trial was rescheduled for January 6, 2014. On November 20, 2013, Miller moved for a continuance, and trial was rescheduled for April 21, 2014. On March 31, 2014, Miller moved for a continuance, and trial was rescheduled for June 9, 2014. On May 19, 2014, Miller moved for a continuance, and trial was rescheduled for October 15, 2014. On September 16, 2014, Milled moved for a continuance, and trial was rescheduled for October 27, 2014.

On October 27, 2014, the date of the latest trial setting, the State moved for a continuance on the ground of newly-discovered evidence, to which Miller objected. Specifically, the State averred that it had received new and previously unknown information regarding a potential witness on October 24, 2014. When the trial court granted the State's motion and set a new trial date of February 9, 2015, Miller also objected. On November 26, 2014, Miller moved for discharge pursuant to Criminal Rule 4. On December 15, 2014, the trial court held a hearing on Miller's discharge motion. During the hearing, it became apparent that the State had sought a continuance to investigate the potential testimony of Jami Holland. The investigator for the Delaware County Public Defender's office testified that he had contacted Holland the week before the hearing and that she indicated she would have been available to testify on

October 27, 2014. The prosecutor argued that, regardless of Holland's availability, the State did not learn of her potential as a witness until two days before the latest trial setting, or October 25, 2014.

[13] On December 29, 2014, the trial court issued an order denying Miller's discharge motion. *Inter alia*, the trial court found in its order that the State did not learn of Holland until on or about October 24, 2014, the State did not have time to procure the evidence at issue, and Miller did not have time to prepare to meet it. The trial court certified the issue for interlocutory appeal, but this court declined to accept jurisdiction. On March 2, 2015, the trial court scheduled trial for April 13, 2015. On April 1, 2015, Miller moved for a continuance, and trial was rescheduled for September 21, 2015.

## III. Trial

[14] At trial, the trial court, over Miller's objection, admitted certain text messages sent from or received by mobile telephones connected to Miller. The text messages fell into two categories: (1) messages sent by Rutledge to Miller and (2) messages sent by Miller to other persons or received by Miller from other persons. State's Exhibits 95 and 96 related to messages sent by Rutledge to Miller. At 3:29 p.m. on December 2, 2011, Rutledge sent the following text message to one of Miller's telephones: "I need u to help me with something asap can u get the truc what time u going home im with griff[.]" State's Ex. 95. At 4:42 p.m., Rutledge texted Miller, "Ur house so hurry we got to get out of town[.]" State's Ex. 96.

[15] State's Exhibits 102 and 103 related to messages sent between Miller and an unidentified person. At 7:06 a.m., the person texted Miller, "RE: |K, r u frontin em to me till I clear up this mess ---------- Pain pills \n[.]" State's Ex. 102. At 7:51 a.m., Miller responded, "How many you want[?]" State's Ex. 102. Miller and her correspondent exchanged several more text messages until 9:18 a.m., with the seeming object of arranging a purchase of "pain pills" from Miller. State's Exhibit 94 contains a text message to Miller which said, "Why did u not tell me what went on and on top of it all u told my son not to tell me \nerin blake\n[.]"

[16] On September 24, 2015, the fourth day of trial, the trial court issued an order quashing Miller's subpoena of Rutledge, which Rutledge had requested based on his Fifth Amendment privilege against self-incrimination. Miller offered testimony from a police officer, which was admitted, that Rutledge had made statements to the officer indicating that he had threatened Miller with harm if she refused to help him dispose of Ingram's body. The jury was instructed on Miller's defenses of duress and necessity. After trial, the jury found Miller guilty as charged, and the trial court sentenced her to six years of incarceration for assisting a criminal and eighteen months for obstruction of justice, both sentences to be served concurrently.

# Discussion and Decision

## I. Speedy Trial

[17] Indiana Rule of Criminal Procedure 4(C) provides in relevant part:

No person shall be held on recognizance or otherwise to answer a criminal charge for a period in aggregate embracing more than one year from the date the criminal charge against such defendant is filed, or from the date of his arrest on such charge, whichever is later; except where a continuance was had on his motion, or the delay was caused by his act, or where there was not sufficient time to try him during such period because of congestion of the court calendar.

[18] Miller was not brought to trial within the aggregate one-year time period. However,

If when application is made for discharge of a defendant under this rule, the court be satisfied that there is evidence for the state, which cannot then be had, that reasonable effort has been made to procure the same and there is just ground to believe that such evidence can be had within ninety (90) days, the cause may be continued, and the prisoner remanded or admitted to bail; and if he be not brought to trial by the state within such additional ninety (90) days, he shall then be discharged.

Ind. Crim. Rule 4(D).

Criminal Rule 4(D) provides that a trial court may grant the State a continuance when it is satisfied that (1) there is evidence for the State that cannot then be had; (2) reasonable effort has been made by the State to procure the evidence; and (3) there is just ground to believe that such evidence can be had within ninety days. [*Chambers v. State*, 848 N.E.2d 298, 301 (Ind. Ct. App. 2006), *trans. denied*.] This court has previously stated that any exigent circumstances may warrant a reasonable delay beyond the limitations of Criminal Rule 4. *Id.* "'The reasonableness of such delay must be judged in the context of the particular case[.]'" *Id.* (quoting *Smith v. State*, 802 N.E.2d 948, 951 (Ind. Ct. App. 2004)). In reviewing Criminal Rule 4 appeals, we employ two standards of review: we review the trial court's legal conclusions de novo but exercise deference with respect to its

factual findings. *See Feuston v. State*, 953 N.E.2d 545, 548 (Ind. Ct. App. 2011) (resolving differing standards of review in Criminal Rule 4 cases).

*Otte v. State*, 967 N.E.2d 540, 545 (Ind. Ct. App. 2012), *trans. denied*. "The reasonableness of such delay must be judged in the context of the particular case, and the decision of the trial judge will not be disturbed except for an abuse of discretion." *Chambers*, 848 N.E.2d at 304 (citation and quotation marks omitted).

[19] Under the circumstances of this case, we cannot conclude that the trial court abused its discretion in granting the State's continuance request pursuant to Criminal Rule 4(D). Indeed, when looked at in the context of the case, the State did not seem to have a reasonable alternative available to it. The State learned of Holland's potential as a witness two or three days before trial on a weekend. After the prosecutor's office "tracked down" Holland's telephone number, she was contacted and the general nature of her possible testimony ascertained. Tr. p. 70. The prosecutor's office then contacted defense counsel and the trial court. We find no fault in the trial court's conclusion that two or three days was simply not enough time for either side to reasonably evaluate Holland's potential as a witness. Miller has failed to establish an abuse of discretion in this regard.

[20] Miller would have us conclude that if it is physically possible to produce a witness for trial, the State cannot receive a continuance pursuant to Criminal Rule 4(D), regardless of when the witness was discovered. Put another way, even though Miller seems to concede that neither the State nor she would have

had time to properly evaluate Holland, she essentially argues that that should not matter. We do not believe that the Rule should be read so rigidly, especially in light of the Indiana Supreme Court's holding "that *any* exigent circumstances may warrant a reasonable delay beyond the limitations of Ind. R. Crim. P. 4[.]" *Loyd v. State*, 398 N.E.2d 1260, 1265 (Ind. 1980) (emphasis added). Moreover, as the State notes, it is safe to assume that Miller would have strenuously objected had the State attempted to have Holland testify on two or three days' notice, which Miller suggests the State should have been required to do. We will not read Criminal Rule 4(D) in a way that leaves the State with such an unreasonable choice.

[21] Finally, Miller argues that Criminal Rule 4(D) does not apply in this case because the State ultimately did not call Holland to testify against Miller. Miller argues that Rule 4(D) extensions should only apply to evidence that the State turns out to need. Such a conclusion would be unreasonable in light of the trial court's finding that there was simply not enough time for either side to evaluate Holland before the scheduled start of trial.

# II. Miller's Subpoena of Rutledge

[22] Miller requested that the trial court issue a subpoena for Rutledge, presumably for the purpose of bolstering her claim that to the extent that she assisted Rutledge or obstructed justice, she did so under duress. The trial court quashed Miller's subpoena, relying on Rutledge's Fifth Amendment right against compelled self-incrimination. Miller contends that, because Rutledge had

already been tried and convicted for his part in Ingram's death, he no longer retained a right against self-incrimination relevant to this case. Miller also contends that the trial court erroneously failed to hold a hearing pursuant to Indiana Code section 35-37-3-1[1] before quashing her subpoena.

[23] We conclude that any error the trial court may have committed in this regard can only be considered harmless. "Errors in the admission of evidence are to be disregarded as harmless unless they affect the substantial rights of the defendant." *Goudy v. State*, 689 N.E.2d 686, 694 (Ind. 1997). "Where wrongfully excluded testimony is merely cumulative of other evidence presented, its exclusion is harmless error." *Spaulding v. Harris*, 914 N.E.2d 820, 830 (Ind. Ct. App. 2009), *trans. denied*.

[24] Miller was able to, and did, introduce evidence that Rutledge had, in fact, threatened Miller with harm, through the testimony of Muncie Police Officer George Hopper, who testified that he interviewed Rutledge on December 5, 2011. (Tr. 609). *Inter alia*, Officer Hopper also testified that Rutledge told him

---

[1] Indiana Code section 35-37-3-1 provides as follows:

> (a) If a witness, in any hearing or trial occurring after an indictment or information has been filed, refuses to answer any question or produce any item, the court shall remove the jury, if one is present, and immediately conduct a hearing on the witness's refusal. After such a hearing, the court shall decide whether the witness is required to answer the question or produce the item.
>
> (b) If the prosecuting attorney has reason to believe that a witness will refuse to answer a question or produce an item during any criminal trial, the prosecuting attorney may submit the question or request to the trial court. The court shall hold a hearing to determine if the witness may refuse to answer the question or produce the item.

that he had threatened Miller and also threatened to kill her children if Miller did not help him dispose of Ingram's body. This evidence, if believed, would have been sufficient to establish Miller's defenses to the charges against her. Testimony from Rutledge to this effect, even assuming that it would have been consistent with his statements to Officer Hopper, would have been merely cumulative. Any error the trial court may have made in quashing Miller's subpoena of Rutledge can only be considered harmless.

# III. Text Messages

[25] Miller contends that the trial court abused its discretion in admitting certain text messages to her from Rutledge and between her and unidentified third persons. We will only reverse a trial court's decision on the admissibility of evidence upon a showing of an abuse of that discretion. *Curley v. State*, 777 N.E.2d 58, 60 (Ind. Ct. App. 2002). An abuse of discretion may occur if the trial court's decision is clearly against the logic and effect of the facts and circumstances before the court, or if the court has misinterpreted the law. *Id*. The Court of Appeals may affirm the trial court's ruling if it is sustainable on any legal basis in the record, even though it was not the reason enunciated by the trial court. *Moore v. State*, 839 N.E.2d 178, 182 (Ind. Ct. App. 2005). We do not reweigh the evidence and consider the evidence most favorable to the trial court's ruling. *Hirsey v. State*, 852 N.E.2d 1008, 1012 (Ind. Ct. App. 2006).

## A. State's Exhibits 95 and 96

[26] Miller challenges the admission of State's Exhibits 95 and 96, which are messages sent by Rutledge to Miller on December 2, 2011: "I need u to help me with something asap can u get the truc what time u going home im with griff[,]" State's Ex. 95, and, "Ur house so hurry we got to get out of town[.]" State's Ex. 96. Miller argues that these text messages are inadmissible hearsay and are irrelevant in any event, *see* Ind. Evidence Rules 801(a); 403, while the State argues that they are admissible as statements of Rutledge's then-existing state of mind or as present-sense impressions. *See* Evid. Rs. 803(3); 803(1).

[27] We need not address the admissibility of the evidence in question, as any error in admitting it can only be considered harmless. "Errors in the admission of evidence are to be disregarded as harmless unless they affect the substantial rights of the defendant." *Goudy v. State*, 689 N.E.2d 686, 694 (Ind. 1997). "[A]n error in the admission of evidence is harmless if the erroneously admitted evidence is cumulative of other evidence appropriately admitted." *Collins v. State*, 826 N.E.2d 671, 679 (Ind. Ct. App. 2005), *trans. denied*.

[28] For one thing, the text messages are marginally prejudicial, at worst. The State argues that the messages are relevant to show Miller's knowledge of Rutledge's requests for assistance. However, even if this is true, the messages, which were not responded to, certainly do not show Miller's assent. In any event, there is no dispute that Miller assisted Rutledge and attempted to help him conceal or destroy evidence of Ingram's murder. The key question at trial was whether

Miller was under duress when she assisted Rutledge, and the text messages from Rutledge do not touch on that question one way or the other. Any error the trial court may have committed in admitting State's Exhibits 95 and 96 can only be considered harmless.

## B. State's Exhibits 102 and 103

[29] State's Exhibits 102 and 103 are text messages sent between Miller and an unidentified person on the morning of December 3: at 7:06 a.m., the person texted Miller, "RE: |K, r u frontin em to me till I clear up this mess ---------- Pain pills \n[,]" and at 7:51 a.m., Miller responded, "How many you want[?]" State's Ex. 102. Miller and her correspondent exchanged several more text messages until 9:18 a.m., with the seeming object of arranging a purchase of "pain pills" from Miller. Miller argues that any marginal probative value of the text messages is substantially outweighed by their prejudicial effect, while the State argues that are admissible to undercut Miller's claim that she assisted Rutledge under duress.

[30] We agree with the State. Evidence Rule 403 provides: "Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, or needless presentation of cumulative evidence." The text message exchange, with Miller's participation beginning at around the time Ingram's body was discovered aflame, tends to strongly undercut her claim that she assisted Rutledge under duress. It is a reasonable inference that Miller would not have exhibited such "business-as-usual"

behavior had she just been forced to assist in the disposal of Ingram's body through the threat of force to herself and her children. Instead of taking steps to seek protection for herself and her children, Miller arranged to sell pain pills to an unidentified third person.

Moreover, although evidence that Miller was selling "pain pills" is somewhat prejudicial, we cannot say that the danger of unfair prejudice substantially outweighs the evidence's probative value. There is no apparent connection between any crime that could be committed by selling "pain pills" and the crimes Miller was charged with here. In other words, we believe that any risk that the jury might have been inclined to convict Miller due to evidence of other bad acts is very low. Moreover, given the conflicting evidence concerning the duress issue, the text messages had a particularly high probative value in this case. Miller has failed to establish an abuse of discretion in this regard.

## C. State's Exhibit 94

State's Exhibit 94 contains a text message sent to Miller at 10:34 p.m. on December 3, 2011, while Miller was already in custody, which said, "Why did u not tell me what went on and on top of it all u told my son not to tell me \nerin blake\n[.]" While Miller asserts that this text message is "perhaps the most prejudicial" of the challenged messages, Appellant's Br. 25, we do not see how it prejudiced her. Even if one accepts that Miller did not, in fact, tell the recipient "what went on" and also told the recipient's son not to tell, we fail to see how this casts Miller in a negative light or tends to establish her guilt of the charged crimes. The text message at issue gives no indication of just what the

recipient knows about what occurred and indicates that she did not get that knowledge from Miller in any event. The admission of State's Exhibit 94, even if erroneous, can only be considered harmless.

# IV. Double Jeopardy

[33] Finally, Miller contends that her convictions for Class C felony assisting a criminal and Class D felony obstruction of justice violate Indiana constitutional prohibitions against double jeopardy. In *Richardson v. State*, 717 N.E.2d 32 (Ind. 1999), the Indiana Supreme Court held "that two or more offenses are the 'same offense' in violation of Article I, Section 14 of the Indiana Constitution, if, with respect to … the actual evidence used to convict, the essential elements of one challenged offense also establish the essential elements of another challenged offense." *Id*. at 49-50.

> To show that two challenged offenses constitute the "same offense" in a claim of double jeopardy, a defendant must demonstrate a reasonable possibility that the evidentiary facts used by the fact-finder to establish the essential elements of one offense may also have been used to establish the essential elements of a second challenged offense.

*Id.* at 53. "In determining the facts used by the fact-finder to establish the elements of each offense, it is appropriate to consider the charging information, jury instructions, and arguments of counsel." *Lee v. State*, 892 N.E.2d 1231, 1234 (Ind. 2008) (citing *Spivey v. State*, 761 N.E.2d at 832 (Ind. 2002); *Richardson*, 717 N.E.2d at 54 n.48).

[34]     In order to convict Miller of Class C felony assisting a criminal, the State was

required to prove that she,

> not standing in the relation of parent, child, or spouse to another
> person who has committed a crime or is a fugitive from justice
> who, with intent to hinder the apprehension or punishment of the
> other person, harbor[ed], conceal[ed], or otherwise assist[ed] the
> person commits assisting a criminal, … a Class C felony if the
> person assisted has committed murder[.]

Ind. Code § 35-44-3-2(2) (2011).  In order to convict Miller of Class D felony

obstruction of justice, the State was required to establish that she "alter[ed],

damage[ed], or remove[ed] any record, document, or thing, with intent to

prevent it from being produced or used as evidence in any official proceeding or

investigation[.]"  Ind. Code § 35-44-3-4 (2011).

[35]     We conclude that Miller's conviction for obstruction of justice cannot stand, as

it violates the same actual evidence test.  While it is true that the charging

information and the trial court's instructions to the jury laid out the distinct

elements of the two crimes with which Miller was charged, the charges and

instructions were merely recitations of the statutory language and did not

specify which specific allegations supported the charges.

[36]     Even more compelling are the evidence presented and arguments made by the

State.  Regarding the assisting a criminal charge, there was no dispute that

Miller was not Rutledge's spouse, parent, or child or that the crime Rutledge

committed was murder.  For the remainder of the required proof, the State

presented evidence that Miller helped to move Ingram's body, clipped her

fingernails, drove Rutledge around looking for a place to dispose of the body, and took Rutledge to the BMW Club where he disposed of bloody clothes. To support the obstruction of justice charge, the State presented evidence that Miller altered and removed Ingram's body, including clipping her nails, loading her body into the vehicle she had borrowed, and driving her body to a remote location, much the same evidence used to support some of the essential elements of the assisting a criminal conviction.

[37] Moreover, the State emphasized essentially the same body of evidence to argue that it had proved assisting a criminal and obstruction of justice:

> First, we have the Assisting a Criminal. Now we know that the defendant is not the parent, child, or spouse of Terry Rutledge. And we know that Terry Rutledge, at the very least, helped carry out the murder of Tonia Ingram. That has not been disputed one bit in all the evidence in this trial. We know that this defendant absolutely assisted Terry Rutledge. She admitted that to the police. She admitted to helping to move Tonia's body. She admitted to cutting Tonia's fingernails. She admitted to driving Rutledge around looking for that spot to dump the body. She admitted to taking Rutledge to the BMW Club. Where he tried to dispose of those bloody clothes. And we know all of that was done, all those acts were carried out to try to avoid or hinder at least Rutledge's arrest and punishment.

Tr. pp. 703-04.

> Next we have the [obstruction] of justice. Again, the defendant's statement by itself tells us that the defendant altered, damaged, or moved a record, document or thing. And again, our common sense tells us there was only one reason why that was done. Why Tonia's fingernails were clipped. Why Tonia's body was moved. Why Tonia's body was set on fire and why those bloody

clothes were disposed of. It was to keep that evidence from being discovered.

Tr. p. 704.

[38] To summarize, there does not seem to be any significant proof produced and relied on to convict Miller of obstruction of justice that was not *also* used to convict her of assisting a criminal. We conclude that Miller has established a reasonable possibility that the jury relied on the same actual evidence to find her guilty of both assisting a criminal and obstruction of justice. *See, e.g.*, *Alexander v. State*, 768 N.E.2d 971, 978 (Ind. Ct. App. 2002) (finding violation of the *Richardson* same actual evidence test where evidence that defendant constructively possessed one handgun "was used to prove both an essential element of the unlawful possession of a firearm by a serious violent felon, i.e. that Alexander possessed a firearm, and all of the essential elements of carrying a handgun without a license[,]" case was argued non-specifically, and defendant was charged generally), *trans. denied*.

[39] We therefore remand with instructions to vacate Miller's conviction for Class D felony obstruction of justice. *See Richardson*, 717 N.E.2d at 54 ("When two convictions are found to contravene double jeopardy principles, a reviewing court may remedy the violation by reducing either conviction to a less serious form of the same offense if doing so will eliminate the violation. If it will not, one of the convictions must be vacated.") (citation omitted).

[40] The judgment of the trial court is affirmed in part, reversed in part, and remanded with instructions.

Bailey, J., and Altice, J., concur.